Rose **KEPPLER**, Plaintiff,

v.

**HINSDALE TOWNSHIP HIGH SCHOOL DISTRICT 86, a quasi-municipal corporation of the State of Illinois, and Roger Miller, Defendants.**

No. 88 C 8506.

United States District Court, N.D. Illinois, E.D.

June 20, 1989.

---

Aldo E. Botti, Botti, Marinaccio & DeSalvo, Ltd., Oak Brook, Ill., for plaintiff.

Anthony G. Scariano, Kathleen Roche Hrisman, Soariano, Kula, Ellch & Himes, Chtd., James O. Nolan, John M. Hynes, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Gretchen A. Winter, Michael A. Warner, Seyfarth, Shaw, Fairweather & Geraldson, Roger K. O'Reilly, John P. Brennan, O'Reilly, Cunningham, Norton & Mancini, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiff Rose Keppler has sued Roger Miller and Hinsdale Township High School District 86 ("District 86") under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and under 42 U.S.C. § 1983 ("§ 1983"). She alleges sexual discrimination and due process violations, but what she really wants is to make others pay for her mistakes. She will not succeed here.

### FACTS

District 86 has two high schools: Hinsdale Central and Hinsdale South. The Superintendent for District 86 controls the day-to-day affairs of both schools. The Superintendent at all times relevant to this case was Dr. John Thorson. He reported directly to the District 86 Board of Education, a seven member body responsible for the termination and reduction of administrators and staff.

Each high school in District 86 has a principal. The principals report directly to the Superintendent. Each principal has assistant principals, department chairmen and teachers, who report directly to him.

Ms. Keppler first became employed by District 86 in 1978 as Coordinator of Education Services. Because this was an administrative position, Ms. Keppler reported directly to Superintendent Thorson. In 1982, Ms. Keppler was made Director of Special Services, another administrative position with accountability directly to the superintendent. Ms. Keppler's office was in Hinsdale Central, but her authority was district wide.

In the fall of 1982, Ms. Keppler met socially on two occasions with Dr. Miller. Dr. Miller had become employed by District 86 in 1980 as an assistant principal at Hinsdale Central. In the fall of 1982, his marriage was in trouble and he was seeking companionship and advice. Ms. Keppler provided them.

By the end of 1982, Dr. Miller's relationship with his wife was over, and he began seeing Ms. Keppler on a regular basis. They had sexual relations frequently and, when the relationship was going well, saw each other during the week as well as on weekends. In 1984, District 86 promoted Dr. Miller to principal of Hinsdale Central.

Dr. Miller and Ms. Keppler continued to see each other through the spring of 1986. Although they also saw other people, and at times contemplated terminating their relationship, they continued to have sexual intercourse on a regular basis when they were together.

By March, 1986, however, things had taken a turn for the worse. After Dr. Miller and Ms. Keppler returned from a weekend together in New Orleans in March, during which they had sexual relations, their sexual relationship was at an end.

From that point on, the evidence is conflicting as to who was tired of whom, and just what transpired when the two were together. For the purposes of this summary judgment motion, this court accepts as true all of the testimony of Ms. Keppler in her deposition and in the affidavit she provided in opposing the summary judgment motion.[1]

---

1. The defendants have objected to Ms. Keppler's affidavit on the grounds that it contradicts the statements she made during her deposition. This court has reviewed both, and although it does appear that Ms. Keppler was less-than-forthcoming in her deposition testimony, nothing in it directly conflicts with the additional statements she has made in her affidavit. Thus, while the defendants' could use the deposition testimony to impeach Ms. Keppler at trial, they cannot have the affidavit stricken at the summary judgment stage.

Ms. Keppler and Dr. Miller saw each other socially on two occasions in April, 1986. On a Sunday in mid-April, Mr. Miller invited Ms. Keppler to accompany him to his parents' home. She agreed to go. Dr. Miller drove the two of them in Ms. Keppler's car. At the end of the day, Dr. Miller drove Ms. Keppler back to his house. He asked her to come in, but she refused. He then became angry and insisted that their sexual relationship should continue. When she refused again, he threw the car keys in her lap, and went inside. Ms. Keppler went home.

Later that month, Dr. Miller asked Ms. Keppler to come to dinner with him and two other couples. Again, Ms. Keppler agreed and met Dr. Miller in the parking lot of a Marriott Hotel. After dinner, the two returned to the Marriott, and Dr. Miller requested that Ms. Keppler come to his place for sexual relations. Ms. Keppler refused, and left.

The next month, Judy Kozienczka (now Judy Miller) had a dinner party to which she invited Ms. Keppler. Ms. Kozienczka asked Ms. Keppler to invite Dr. Miller to the dinner. Ms. Keppler agreed to do so, and Dr. Miller agreed to go with her. This was the last time that Ms. Keppler and Dr. Miller saw each other socially (though not the last time that Ms. Kozienczka and Dr. Miller did so).

At some point in 1986, Ms. Keppler's administrative position was changed from Director of Special Services to Director of Curriculum, Instruction, Staff Development and Special Services ("Director of Curriculum"). As part of her new job, Ms. Keppler continued to have considerable responsibility for special services, but also took on additional responsibilities. She still reported directly to Superintendent Thorson.

In August, 1986, Dr. Miller told Ms. Keppler that she had lost professional credibility in his eyes, and that as far as he was concerned she should leave the district. From August, 1986 through February, 1988, Dr. Miller made a number of negative comments to Superintendent Thorson about Ms. Keppler's performance as Director of Curriculum. Superintendent Thorson, noting the antagonistic relationship between Dr. Miller and Ms. Keppler, decided to transfer Ms. Keppler's office to Hinsdale South for the 1987–88 school year.

In early 1988, Superintendent Thorson met with Ms. Keppler and told her that he thought that she should resign her position as Director of Curriculum. When Ms. Keppler asked why, Thorson indicated that it was because of her poor relationship with the principals of the two district high schools. The superintendent noted that she had tenure as a teacher and could therefore stay with the district in that capacity, but told her that she would have to give up her administrative role. He also indicated that he hoped she would not accept a teaching role, and would instead leave the district. Ms. Keppler told him that she would think it over.

On February 15, at a Board meeting, Superintendent Thorson recommended that the Board terminate Ms. Keppler's position as Director of Curriculum. An extensive discussion ensued, but the members agreed not to take any action until Ms. Keppler decided whether or not to resign.

On February 28, Ms. Keppler met with Dr. Richard Spiegel, president of the Board. Dr. Spiegel informed Ms. Keppler that he thought she should resign. At that point, Ms. Keppler informed Dr. Spiegel of her previous relationship with Dr. Miller, and of her belief that the principal's attitude toward her was engendered in part by the fact that she had terminated the relationship. She also stated that she would consider legal action if the Board decided to terminate her administrative position.

At a Board meeting on March 28, 1988, the Board agreed that Ms. Keppler's position would probably be terminated for the following year, but also decided that Ms. Keppler should be given the opportunity to meet with Superintendent Thorson one last time before the Board took final action. Dr. Thorson sent Ms. Keppler a letter that day suggesting a meeting, but Ms. Keppler never responded.

On April 4, 1988, the Board voted unanimously to terminate Ms. Keppler's position

as Director of Curriculum, and to do away with that position, at least in the near future, for financial reasons. Ms. Keppler was then transferred to a position as special education teacher for the 1988–89 school year, and to a salary level commensurate with that position.

Ms. Keppler thereafter filed this action against Dr. Miller and District 86. Count I seeks relief under 42 U.S.C. § 1983 and alleges that Dr. Miller violated her equal protection rights by discriminating against her on the basis of her sex. Count II also seeks relief under § 1983, but against District 86 for violating her rights to due process by depriving her of her position as Director of Curriculum without a hearing. Count III arises under Title VII, and alleges that District 86, as Ms. Keppler's employer, discriminated against her on the basis of sex by relying on Dr. Miller's recommendation that her administrative position be terminated.

## DISCUSSION

### The Sex Discrimination Claims

Counts I and III differ in that the former seeks recovery under § 1983 from Dr. Miller while the latter seeks it under Title VII from District 86. The counts are similar, however, in that both are predicated on Dr. Miller's alleged sexual harassment.[2] To prevail on either claim, Ms. Keppler must first show that Dr. Miller discriminated against her because of her sex. *See Volk v. Coler*, 845 F.2d 1422, 1437–38 (7th Cir. 1988). Since Ms. Keppler cannot do so, this court need not consider whether the district could be held liable under Title for Dr. Miller's actions.

In recent years, courts have recognized that sexual harassment is a type of discrimination within the proscription of Title VII and the Equal Protection Clause. *Bertoncini v. Schrimpf*, 712 F.Supp. 1336 (N.D.Ill.1989), *see generally* Vhay, The Harms of Asking: Towards a Comprehensive Treatment of Sexual Harassment, 55 U.Chi.L.Rev. 328 (1988). Sexual harassment takes two forms. The first kind, *quid pro quo* sexual harassment, occurs when an employer[3] expressly or impliedly makes sexual favors a condition for the employee to receive or retain job benefits, or deprives the employee of job benefits on the basis of the employee's refusal to engage in sexual relations. *Highlander v. K.F.C. National Management Company*, 805 F.2d 644, 648 (6th Cir.1986); *see Horn v. Duke Homes, Division of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 603 (7th Cir.1985). The other kind of sexual harassment occurs when an employer, either with or without hopes of sexual favors, subjects an employee to sexual innuendos, remarks, and physical acts so offensive as "to alter the conditions of [the employee's] employment and create an abusive working environment." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (1986); *see generally* Note, Sexual Harassment Claims of Abusive Work Environment Under Title *VII*, 97 Harv.L.Rev. 1449 (1984). *But see* Notes, Between the Boss and a Hard Place: A Consideration of *Meritor Savings Bank, FSB v. Vinson* and the Law of Sexual

---

2. Title VII, 42 U.S.C. § 2000e–2 provides, in pertinent part:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
 Likewise, the Equal Protection Clause, the substantive constitutional provision upon which Ms. Keppler predicates her § 1983 sex discrimination claim, prohibits discrimination based on sex. *Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir.1986).

3. Title VII imposes liability only against employers. The defendants have argued that Dr. Miller was not Ms. Keppler's employer, but rather her co-worker, and thus that the district cannot be held accountable for Dr. Miller's conduct. Ms. Keppler, however, has provided evidence that her duties involved working closely with the principals of the District 86 high schools, and that Dr. Miller had the responsibility to report on her work. For the purposes of this motion, the court assumes that Dr. Miller was Ms. Keppler's employer for Title VII purposes. *See North v. Madison Area Association for Retarded Citizens–Developmental Centers Corp.*, 844 F.2d 401, 407 (7th Cir.1988).

Harassment, 67 B.U.L.R. 445, 466–67 (1987) (arguing that the two forms of sexual harassment claims should be treated as one).

■■■ Under the evolving case law, the distinction between these two forms of sexual harassment is fundamental. A single incident of sexual harassment can give rise to a quid pro quo claim: an employer may not force an employee to engage in sexual relations on threat of losing her job, and an employer may not penalize an employee who rejects his sexual advances. *Highlander v. K.F.C. National Management Company*, 805 F.2d at 649. But a single incident generally cannot result in a hostile environment claim, for (except in extreme circumstances such as rape) a single offensive remark or touching does not make an employment environment hostile. *See generally* Notes, Perceptions of Harm: The Consent Defense in Sexual Harassment Cases, 71 Iowa L.Rev. 1109, 1117 n. 54 (1986) (citing *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982)).

The complaint in this case does not specify whether it is predicated on quid pro quo sexual harassment, hostile environment sexual harassment, or both. The complaint contains allegations that, after the consensual relationship between Dr. Miller and Ms. Keppler ended, Dr. Miller subjected Ms. Keppler to "unwelcome sexual harassment, advances, and requests for sexual favors." This suggests an hostile environment claim. The complaint, however, then goes on to allege that, as a result of Ms. Keppler's refusals to comply with Dr. Miller's requests for sexual relations, Dr. Miller engaged in a campaign to have Ms. Keppler removed from her position as Director of Curriculum, a campaign that ended in success when the Board relied on his complaints about Ms. Keppler and terminated her administrative position. These allegations indicate that Ms. Keppler is seeking to recover on a quid pro quo theory.

In their motion for summary judgment, the defendants addressed the complaint as alleging both hostile environment and quid pro quo sexual harassment. They attempted to show that Dr. Miller's relationship with Ms. Keppler was primarily consensual, and that on the few occasions when Dr. Miller made unwelcome sexual advances to Ms. Keppler, his actions were neither hostile nor abusive. The defendants also sought to establish that Dr. Miller never recommended that Ms. Keppler's administrative position be terminated, and that any negative comments he did make about her played no role in the Board's ultimate decision to terminate her.

Ms. Keppler responded by introducing evidence that Dr. Miller's sexual advances had been unwelcome, and appeared at first to be setting the stage for a hostile environment claim. In the end, however, she conceded that she had not made out a case of hostile environment sexual harassment, and that the gravaman of her case was that Dr. Miller had embarked on his campaign against her in retaliation for her rejection of him—i.e., quid pro quo sexual harassment.

In support of this claim, Ms. Keppler first noted that a single incident of sexual harassment can suffice to establish a quid pro quo. She then argued that Dr. Miller's conduct following Ms. Keppler's rejection of him, and Superintendent Thorson's subsequent reliance on their failed relationship as one reason for recommending Ms. Keppler's demotion, created a jury question as to whether Ms. Keppler had suffered sex discrimination.

Ms. Keppler's quid pro quo claim, however, collides with the Seventh Circuit's ruling in *Huebschen v. Department of Health and Social Services*, 716 F.2d 1167 (7th Cir.1983). In that case, a male employee brought suit against a female supervisor under § 1983 and Title VII alleging sex discrimination. The two had been involved in a consensual sexual romance, but when their relationship deteriorated, the female defendant immediately began treating her ex-lover badly, and within a week indicated that there were problems with his job. A short time later, the plaintiff was fired on the defendant's recommendation.

The Court held that, although the plaintiff had been treated unfairly, he had not established sex-based discrimination:

> The proper classification, if there is one at all, was the group of persons with whom [defendant] had or sought to have an affair. It was this group, of which [plaintiff] may have been the only one, that [defendant] sought to disadvantage. As unfair as [defendant's] treatment of [plaintiff] may have been, we are simply not persuaded that the Equal Protection Clause should protect such a class.

*Id.* at 1172.

Does *Huebschen* mean that once an employee engages in consensual sex with an employer, she forfeits any right to legal protection from that employer? Certainly not. The *Huebschen* Court specifically distinguished its case from *Woerner v. Brzeczek*, 519 F.Supp. 517 (N.D.Ill.1981), and thereby made clear that a hostile environment claim remains available after a consensual sexual relationship comes to an end.

But what about quid pro quo claims? Here, it is more difficult to discern *Huebschen*'s message. The opinion's language suggests that once a person engages in consensual sex with an employer, the employee may not thereafter complain if the employer threatens termination as a penalty for ending the relationship. But it need not be read this broadly.

To understand *Huebschen,* it is first necessary to subcategorize quid pro quo claims. The standard form of quid pro quo sexual harassment involves express or implied demands for sexual favors in return for job benefits: "You have sex with me, and you will get a raise (or keep your job, or whatever)." A different situation arises, however, when an employer makes sexual advances to an employee, but without either expressing or implying that the employee's job will be affected by a refusal. The employee may be annoyed, or even amused, but feeling no compulsion to comply, she simply rejects the employer's efforts. The employer then fires or demotes the employee, or just makes life miserable, but without further sexual advances or in-

nuendos. These cases are really not quid pro quo claims at all, and will be referred to here as "sexual retaliation" cases, for lack of a better term.

Courts rarely have distinguished between standard and sexual retaliation quid pro quo claims because, in the ordinary case where no prior consensual relationship has occurred, both amount to sexual discrimination. Title VII prohibits employers from using sex as a criteria for employment benefits: An employer may not penalize an employee for refusing to engage in sexual relations. Whether the refusal followed a threat of penalty does not alter the fact that the employer discriminated on the basis of sex.

Moreover, as a factual matter it is often difficult to differentiate between the two: An employee who is fired after rejecting a sexual advance may testify that she felt threatened by termination when she refused, and if her employer has penalized (or rewarded) others in the office for their response to his actions, she may indeed have faced an implied quid pro quo situation.

The distinction between standard and retaliatory quid pro quo, however, does become significant in the context of a prior consensual relationship. In such cases, the termination of the sexual relationship involves not just the cessation of copulation, but the end of a prior intimate relationship. An employer who threatens a penalty if the employee will not continue the physical relationship is using gender as a basis for job benefits. But an employer who seeks retribution because his former lover has jilted him may be reacting not to the rejection of copulation *per se*, but to the change in the status quo—that is, the termination of the intimate physical and emotional relationship.

If *Huebschen* is to be taken as anything but wrong, it must be seen as drawing a distinction between standard and retaliatory quid pro quo claims. The Court could not have meant that an employer who has engaged in consensual copulation with an employee may thereafter demand it as a condition of retaining job benefits. The

Court, however, may have been saying that when an employer penalizes an employee after the termination of a consensual relationship, a presumption arises that the employer acted not on the basis of gender, but on the basis of the failed interpersonal relationship—a presumption rebuttable only if the employee can demonstrate that the employer demanded further sexual relationships before taking the action he did.

Read in this way, *Huebschen* makes a great deal of sense. Title VII prohibits discrimination in the workplace. An employee has the right to work in an atmosphere free from sexual abuse, and to obtain the privileges and benefits of her employment without having to provide sexual favors to her employer. An employee who chooses to become involved in an intimate affair with her employer, however, removes an element of her employment relationship from the workplace, and in the realm of private affairs people do have the right to react to rejection, jealousy and other emotions which Title VII says have no place in the employment setting.

Such an employee, of course, always has the right to terminate the relationship and to again her sever private life from the workplace; when she does so, she has the right, like any other worker, to be free from a sexually abusive environment, and to reject her employer's sexual advances without threat of punishment. Yet, she cannot then expect that her employer will feel the same as he did about her before and during their private relationship.[4] Feelings will be hurt, egos damaged or bruised. The consequences are the result not of sexual discrimination, but of responses to an individual because of her

former intimate place in her employer's life. *Compare Volk v. Coler*, 845 F.2d at 1433 ("Discrimination and harassment against an individual woman *because of her sex* is a violation of the equal protection clause.") (emphasis added).

Ms. Keppler's case presents the latter scenario. After her relationship with Dr. Miller ended, he did not abuse her or in any way harass her at the office. Nor did he even hint that by refusing to continue their sexual relationship she was jeopardizing her job. Instead, even assuming the truth of Ms. Keppler's testimony, Dr. Miller requested on a few occasions that they resume their relationship, and became angry when she refused. Bearing a grudge, he then embarked on a campaign to denigrate her in the eyes of Superintendent Thorson, with the ultimate goal of having her removed from her ·administrative position.[5]

 *Huebschen* teaches that Dr. Miller's conduct did not violate Title VII. Because the two had engaged in a prior consensual relationship, Ms. Keppler could establish sexual discrimination only by rebutting the presumption that Dr. Miller penalized her not because she was a woman, but instead because she was his former lover. To do this, she had to show (at this stage, provide evidence from which a jury could find) not merely that Dr. Miller wanted their relationship to continue, but that Dr. Miller threatened punishment if copulation or some form of erotic engagement was refused. She has not done so. Even if Dr. Miller did seek retribution against Ms. Keppler for abandoning their relationship—and it is by no means clear that he did—the most she has shown is that Dr. Miller reacted harshly to their failed relationship.[6]

**4.** By contrast, in the ordinary case where no prior consensual relationship has occurred, an employee does have the right to expect that her employer will feel the same about her—or at least treat her the same—if she declines his sexual advances.

**5.** In their reply brief, the defendants have argued that Ms. Keppler could not show a causal connection between her rejection of Dr. Miller and Dr. Miller's later negative comments about her. In support of this argument, they point to two occurrences in June, 1986, after the rejection but before the negative comments began,

which suggest that Dr. Miller became annoyed with Ms. Keppler for purely professional reasons. Although this argument would have had force, this court cannot consider it. For the defendants failed to include the June events in their Rule 12(e) statement of material facts not in dispute, and thereby deprived Ms. Keppler the opportunity to address these facts in her response to the summary judgment motion.

**6.** Had Ms. Keppler presented evidence that Dr. Miller threatened her with reprisals if she declined his efforts to continue their sexual relationship, he still could have argued that it was

*Huebschen* says that this is not sexual discrimination under the anti-discrimination laws.[7] Accordingly, summary judgment will be entered against Ms. Keppler on Counts I and II of her complaint.

■ This ruling still leaves open the question of sanctions. With his motion for summary judgment, Dr. Miller also moved for sanctions under Fed.R.Civ.P. 11 against Ms. Keppler and her attorneys on the grounds that the sexual harassment claims in the complaint lacked a reasonable factual basis. Although this court deferred further briefing on the Rule 11 motion pending the resolution of the summary judgment motion, it is apparent from Ms. Keppler's response to the latter motion that the allegations of abusive sexual harassment merely formed the backdrop for her quid pro quo claim. She did not mean to plead that Dr. Miller's actions gave rise to a hostile environment claim; she meant only to set forth the Dr. Miller had made sexual advances to her, and that her refusals led him to seek her termination.

Dr. Miller is understandably upset by Ms. Keppler's pleadings. An allegation of sexual retaliation is bad enough; when compounded with a claim that he was sexually abusing a woman in the workplace, it could prove devastating to a man who works closely with women every day, some only of high school age.

Nevertheless, the allegations on this score in the complaint do not allow for an imposition of Rule 11 sanctions. They are unnecessarily harsh, and demonstrate vindictiveness more than anything else. Based on Ms. Keppler's testimony, however, they are not patently false, for Dr. Miller's actions in April and May, 1986 suggest that he did want his sexual relationship with Ms. Keppler to continue, and that he became angry when Ms. Keppler refused. Thus, while Ms. Keppler and her attorneys will have to live with pleading this case as something it is not, they do not have to pay sanctions for doing so. *See Beeman v. Fiester*, 852 F.2d 206, 210–11 (7th Cir.1988) (complaint is "well grounded in fact" so long as filing attorneys, after reasonable inquiry, have a reasonable basis for the facts they allege).

*The Due Process Claim*

Ms. Keppler also brings a procedural due process claim against District 86 for allegedly removing her from her position as Director of Curriculum without a proper hearing. It is by now well-established that whereas the federal Constitution prohibits the deprivation of property without due process of law, the source of property rights lies in substantive state law. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Thus, before Ms. Keppler may challenge the procedures accompanying her transfer from administrator to teacher, she must establish that this transfer amounted to a deprivation of property under Illinois law.

In order to establish a property interest in her position as Director of Curriculum, Ms. Keppler must show that Illinois law grants her a "legitimate claim of entitlement" to that position. *Lee v. County of Cook*, 862 F.2d 139, 141 (7th Cir.1988). Ms. Keppler points to Ill.Rev.Stat.1987 ch. 122, ¶ 24–11, as well as Illinois case law interpreting this provision, as the source of her property rights. Paragraph 24–11 grants "contractual continued service"—i.e., tenure—to teachers after two (or in some cases, three) years. The term "teacher" in

---

her rejection of him, not her rejection of sex, that motivated his subsequent actions. In that case, however, it would have been for the jury to resolve the matter.

7. Ms. Keppler attempts to distinguish *Huebschen* on the grounds that in that case there was no evidence that, after the consensual sexual relationship ended, the defendant made further requests for sexual favors. Yet, the presence or absence of a specific request could not have served as the basis for the Seventh Circuit's ruling since, as the district court held, there was evidence supporting the jury's verdict that the plaintiff's "refusal to continue a sexual relationship motivated the decision to fire him." *Huebschen v. Department of Health & Social Services*, 547 F.Supp. 1168, 1176 (W.D.Wis.1982), *rev'd*, 716 F.2d 1167 (7th Cir.1983). Whether explicit or implicit, a desire to continue a prior consensual relationship is not, on its own, an impermissible basis for personnel action under Title VII.

the statute includes all school employees, including teachers as well as administrators. *McNely v. Board of Education*, 9 Ill.2d 143, 137 N.E.2d 63 (1956).

■ An administrator, however, "does not acquire tenure in [his] position ..., but rather acquires tenure as a certified employee of the school district." *Lester v. Board of Education School District No. 119*, 87 Ill.App.2d 269, 280, 230 N.E.2d 893 (1967). Thus, although a tenured administrator (such as Ms. Keppler) has a property right in some position within her school district, she suffers no deprivation of property if she is transferred from an administrative to a teaching position. *See Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 984 (7th Cir. 1986); *Danno v. Peterson*, 421 F.Supp. 950 (N.D.Ill.1976) (Flaum, J.).

■ Ms. Keppler concedes all this. Nevertheless, she insists that she had a property right in her administrative position based on a single sentence of dicta in *Lester* stating that "a person serving as superintendent, principal and teacher, or in any two of such positions, may be assigned by the board to any one of the positions he is qualified to fill, *provided such action is bona fide and not in the nature of chicanery or subterfuge designed to subvert the provisions of the Teacher Tenure Law.*" 87 Ill.App.2d at 280, 230 N.E.2d 893 (emphasis added); *accord Thrash v. Board of Education of School District No. 189*, 106 Ill.App.3d 182, 184, 62 Ill.Dec. 68, 435 N.E.2d 866 (1982). According to Ms. Keppler, her claim that the Board transferred her to a teaching post in the hope that she would leave the district altogether makes the Board's conduct a subterfuge, and thereby magically transforms her subjective interest in an administrative position into an objective property right. Ms. Keppler's argument fails for two reasons.

First, although *Lester* shed no light on what would constitute "chicanery or subterfuge," subsequent cases make clear that, whatever this means, it does not prohibit the Board from transfering an administrator to a teaching position in the hope that she will quit. *Lane v. Board of Edu-*

*cation of Fairbury–Cropsey Community Unit School District No. 3*, 38 Ill.App.3d 742, 745, 348 N.E.2d 470 (1976); *Van Dyke v. Board of Education of School District No. 57*, 115 Ill.App.2d 10, 18–19, 254 N.E.2d 76 (1969). *Compare Hansen v. Board of Education of School District 65*, 150 Ill. App.3d 979, 104 Ill.Dec. 204, 502 N.E.2d 467 (1986) (Board could not transfer tenured music teacher to non-teaching, non-certified position without due process). Thus, Ms. Keppler has no basis for claiming that her transfer was an improper subterfuge.

Second, even if *Lester* could be read as delineating an exception to the "at will" nature of an administrative position, this exception would not give rise to a property right. Ms. Keppler does not maintain, as she cannot, that she had a legitimate entitlement not to be transferred without cause; instead, she insists that she had a legitimate entitlement not to be transferred as a subterfuge—that is, in derogation of the Teacher Tenure Law.

Ms. Keppler's argument thus boils down to the position that the Board could not fire her in violation of the law. As such, it is a tautology. Of course, Ms. Keppler had the right not to be dismissed in violation of the law, but the mere fact that the Illinois courts have said so does not mean that she had a legitimate expectation of remaining in her administrative position. *Cf. McGill v. Board of Education of Pekin Elementary School*, 602 F.2d 774, 780 (7th Cir. 1979) (Illinois teacher had no property right to teach in a particular school but could bring a First Amendment claim that her transfer was in retaliation for protected speech). The subterfuge exception provides no substantive criteria limiting the Board's authority to transfer Ms. Keppler, and therefore granted Ms. Keppler no assurances that she would remain Director of Curriculum. *See Yatvin v. Madison Metropolitan School District*, 840 F.2d 412 (7th Cir.1988). If the Board transferred Ms. Keppler as a subterfuge, Ms. Keppler might have a state law claim, but she does not have a constitutionally cognizable property right in her position. *See Bishop v.*

*Wood,* 426 U.S. 341, 349 n. 13, 96 S.Ct. 2074, 2080 n. 13, 48 L.Ed.2d 684 (1976); *George v. Conneaut Board of Education, Conneaut City School District,* 472 F.2d 132, 133 (6th Cir.1972).

## CONCLUSION

The defendants' motion for summary judgment is granted, and judgment is entered for the defendants and against Ms. Keppler on all counts of the complaint. The defendants' motion for sanctions is denied.