CADY, Chief Justice
(concurring specially).
I concur in the majority opinion, but write separately to further explain the basis and rationale for the decision. Melissa Nelson set forth a claim for sex discrimination recognized by law, but the facts of the case did not establish the claim.
Our state and federal civil rights laws were enacted to eradicate various forms of discrimination from society. These laws prohibit employment discrimination based on numerous grounds, including discrimination “because of ... sex.” 42 U.S.C. § 2000e-2(a)(l) (2006); Iowa Code § 216.6(l)(a) (2009). The primary purpose of this law has been to ensure that similarly situated employees are not treated differently because their sex differs. Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 71, 97 S.Ct. 2264, 2270, 53 L.Ed.2d 113, 123 (1977).
While the goal behind prohibiting sex discrimination in the workplace is fundamental to a complete society, the task of determining a more precise meaning of sex discrimination has largely been left for the courts. Discrimination is abhorrent to the powerful echoes of the principle of equality that still resonate today from the voices of our forefathers centuries ago, but the struggle to understand and change remains. Yet, as revealed by our history, the process provided by the courts can often be the best environment for those echoes to be heard with greater clarity, aided by the benefit of a greater understanding achieved over the passage of time. A sharper meaning of sex discrimination, however, can be elusive, not only due to constraints on understanding, but also because of the inherent difficulty of fully capturing the intent of the legislature *74 within an environment dominated by the venerable doctrine of employment at will, which still receives broad support. See Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 280-82 (Iowa 2000) (reviewing the history of the at-will employment doctrine).
These challenges to defining sex discrimination in the workplace have, at times, created controversy and divisiveness, especially when decisions by courts are not fully explained or when court decisions are not fairly read and interpreted or accepted. The task has also been compounded because the statutory language handed down by the legislature for the courts to interpret and apply in each case could not be more general. This law declares nothing more than workplace discrimination “because of ... sex” is illegal. See Iowa Code § 216.6(l)(a). Additionally, although we often presume Title VII and the Iowa Civil Rights Act to have similar scope and meaning, see Hulme v. Barrett, 449 N.W.2d 629, 631 (Iowa 1989), federal courts often declare that Congress provided little legislative history and explanation to guide courts in interpreting the prohibition against discrimination based on “sex.” See, e.g., Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 63-64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49, 57-58 (1986).[8]
In the end, of course, the inherent difficulty of defining sex discrimination is understandable because its meaning is often more obvious in principle than when it is applied to a particular factual circumstance. Yet, the accumulation of court cases continues to shape its meaning, all seeking to express the intention of the legislature and to fulfill the purpose of these statutes. Perhaps this approach was the intent of the legislature.
Since the enactment of this nation’s civil rights law in 1964, courts have generally interpreted “sex” discrimination in the workplace to mean employment discrimination as a result of a person’s gender status. See, e.g., Smith v. City of Salem, 378 F.3d 566, 575 (6th Cir.2004) (“Sex stereotyping based on a person’s gender nonconforming behavior is impermissible discrimination .... ”). Of the legislative histo *75 ry that is available for courts to use to determine legislative intent, it was mostly clear that gender, not sexual activity, was the sole focus of the legislation. See Mitchell Poole, Comment, Paramours, Promotions, and Sexual Favoritism: Unfair, But Is There Liability?, 25 Pepp. L.Rev. 819, 846-48 (1998) (noting the historical background). Thus, courts have generally recognized that discrimination exists in the workplace when similarly situated employees are treated differently “because they differ with respect to ... sex.” Trans World Airlines, 432 U.S. at 71, 97 S.Ct. at 2270, 53 L.Ed.2d at 123. More to the point, the differential proscribed by the law “must be a distinction based on a person’s sex, not on his or her sexual affiliations.” DeCintio v. Westchester Cnty. Med. Ctr., 807 F.2d 304, 306-07 (2d Cir.1986). In other words, differential treatment based on an employee’s status as a woman constitutes sex discrimination, while differential treatment on account of conduct resulting from the sexual affiliations of an employee does not form the basis for a sex-discrimination claim. Id. at 308 (concluding that prohibiting terminations based on sexual affiliation would distort the meaning of the word “sex” in the context of Title VII and involve the EEOC and federal courts in the policing of personal relationships).
This distinction serves as the foundation of this case and other such cases in which employees suffer adverse employment consequences because they are involved in opposite-sex personal relationships with their employer.[9] The complexity of such eases is not necessarily tied to the complexity of the law as much as the complexity of human relationships and interactions with others. Nevertheless, the law does not escape some blame for the difficult nature of the issue in light of the countervailing employment-at-will doctrine, which permits employers to terminate employees for reasons personal to them, so long as the will of the employer is not discriminatory or otherwise against public policy. See Fitzgerald, 613 N.W.2d at 280-82. This law is our Iowa law. Id. Thus, while the loss of a job is often devastating to an employee, and at times unfair, these considerations do not play a role under our employment-at-will doctrine, and our exceptions to this law, such as sex discrimination, are only based on the underlying discriminatory motivation of the decision maker. See Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 762 (Iowa 2009) (noting wrongful-termination claims may not be based “on generalized concepts of socially desirable conduct”). Of course, the unfairness is enhanced for employees when the termination results from a personal relationship with the employer because only the employee suffers the loss of a job, while the other participant in the relationship does not. This result can make acceptance of the law even more difficult.
What has emerged from this complex area of the law is the general legal principle that an adverse employment consequence experienced by an employee because of a voluntary, romantic relationship does not form the basis of a sex-discrimination suit. See Kahn v. Objective Solutions, Int’l, 86 F.Supp.2d 377, 382 (S.D.N.Y.2000) (collecting cases). Moreover, this general rule is not confined to relationships involving sexual intimacy. The same rule is applied to consensual affiliations involving sexually suggestive conduct. See Tenge v. Phillips Modern Ag Co., 446 F.3d 903, 910-11 (8th Cir.2006) *76 (holding no sex discrimination occurred when an employee was fired in a case in which the employee engaged in physical conduct of a suggestive and risqué nature with her employer and wrote sexual or intimate notes to her employer); Platner v. Cash & Thomas Contractors, Inc., 908 F.2d 902, 905 (11th Cir.1990) (holding no sex discrimination occurred when an employee was fired after engaging in sexually suggestive conduct with her supervisor, who was also the owner’s son). When employees are terminated due to consensual, romantic or sexually suggestive relationships with their supervisors, courts generally conclude the reason does not amount to sex discrimination because the adverse employment consequence is based on sexual activity rather than gender.
While courts have been slow to examine the core reasoning for excluding consensual sexual affiliations between employees and employers from the protection of sex-discrimination laws, such an examination offers helpful insight. Close personal relationships between men and woman can often produce personal emotions and conduct that are unfamiliar to the workplace relationship targeted by the general prohibition against gender discrimination in the workplace. See Keppler v. Hinsdale Twp. High Sch. Dist. 86, 715 F.Supp. 862, 869 (N.D.Ill.1989). To be sure, a consensual personal relationship alters the workplace relationship and produces responses and consequences that laws protecting an employee’s right to work in an employment environment free from gender discrimination were not intended to protect. See id. This observation does not pass judgment on the conduct that defines a personal relationship between an employer and employee, but identifies the practical change in an employment relationship that occurs when a relationship extends beyond the workplace. It also recognizes that the law against workplace discrimination only seeks to protect a woman from discrimination based on her status as a woman in the workplace, not on her consensual sexual relationships or personal affiliations with her employer. DeCintio, 807 F.2d at 306-07. The same protection, of course, applies to men. Under this common-sense rationale, a response by the employer to a consensual personal or romantic relationship that becomes a reason for termination is not based on the sex of the employee, but conduct arising from the relationship.[10] No fault or blame for the relationship is considered, only the practical reality of its presence in the workplace as a potential ingredient of adverse employment consequences. See, e.g., Freeman v. Cont’l Technical Servs., Inc., 710 F.Supp. 328, 330-31 (N.D.Ga.1988).
On the other hand, within the broad spectrum of cases that describe either conduct or gender status lies employer-employee relationships that, even though they are close, produce no suggestion of sexual activity or intimacy to support concluding the termination was grounded on conduct. As with so many legal issues, however, a gray area exists somewhere between these two groups of cases in which the law draws a line based on the individual facts and circumstances of each case.
In this case, Nelson has unmistakably stated a claim protected by our laws *77 against sex discrimination.[11] She asserts that the sexual attraction her employer developed for her, which was the reason for her termination, was his creation and not the result of a personal relationship she maintained with him. Consequently, she maintained she did nothing for the law to now require her to assume responsibility for his attraction to her except exist in the workplace as a woman.
It is abundantly clear that a woman does not lose the protection of our laws prohibiting sex discrimination just because her employer becomes sexually attracted to her, and the employer’s attraction then becomes the reason for terminating the woman once it, in some way, becomes a problem for the employer. If a woman is terminated based on stereotypes related to the characteristics of her gender, including attributes of attractiveness, the termination would amount to sex discrimination because the reason for termination would be motivated by the particular gender attribute at issue. See Smith, 378 F.3d at 574 (noting an employer who discriminates against women because they do not wear dresses or makeup engages in sex discrimination because the discrimination is due to the gender of the victim); Gerdom v. Cont’l Airlines, Inc., 692 F.2d 602, 608-09 (9th Cir.1982) (holding a hiring restriction imposing a maximum weight on female flight attendants violated Title VII and noting the restriction “[sjubsumed ... the view that, to be attractive, a female may not exceed a fixed weight”).
Similarly, implicit in our laws against sex discrimination is that both men and woman are responsible for their own sexual desires and responses to attributes of the sex of the other, and neither sex is responsible to monitor or control the desires of the other sex. Thus, just as an employer cannot fire an employee for not conforming to a sex stereotype embraced by the employer or their customers, an employer cannot legally fire an employee simply because the employer finds the employee too attractive or not attractive enough. Cf. Price Waterhouse v. Hopkins, 490 U.S. 228, 251, 109 S.Ct. 1775, 1790-91, 104 L.Ed.2d 268, 287-88 (1989), superseded by statute, Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, 1075-76, as recognized in Univ. of Tex. Sw. Med. Ctr. v. Nassar, — U.S.-,-, 133 S.Ct. 2517, 2526, 186 L.Ed.2d 503, — (2013); Lewis v. Heartland Inns of Am., L.L.C., 591 F.3d 1033, 1037 (8th Cir.2010) (holding an employee suffered sex discrimination when terminated by the employer *78 because he did not feel she had a “Midwestern girl look”).
Accordingly, Nelson has stated a claim supported by our law. Yet, legal claims must also be supported by facts. When placed under the scrutiny of this legal proposition, Nelson’s claim fails because the facts failed to support her claim. The fact of the matter is Nelson was terminated because of the activities of her consensual personal relationship with her employer, not because of her gender. A review of the summary judgment record bears out this conclusion.
It is an undisputed fact in this case, viewing the evidence in a light most favorable to Nelson, that Nelson and Dr. Knight developed a consensual personal relationship. Similarly, it is undisputed that this relationship extended well beyond the workplace. Nelson and Dr. Knight communicated with each other outside the workplace on matters extraneous to the employment. Their relationship was personal and closer than the relationships Dr. Knight maintained with the other employees. Dr. Knight readily acknowledged he grew attracted to Nelson and was developing feelings of intimacy, and it is accepted for purposes of summary judgment that these feelings were more developed than those possessed by Nelson. Yet, during a frustrating moment involving a co-employee, Nelson confided in Dr. Knight that he was the reason she continued to work at the office. She also acknowledged she maintained a closer relationship with Dr. Knight than he maintained with the other employees in the office. Additionally, Nelson acknowledged that another employee in the office viewed her conduct towards Dr. Knight as flirting, although Nelson believed this employee felt she flirted with Dr. Knight because the employee was jealous of the close relationship she enjoyed with Dr. Knight.
The communication between Nelson and Dr. Knight included comments by Dr. Knight that were marked by sexual overtones. These communications have been explained by the majority. One evening after texting her about the tight shirt she wore to work that day, he followed up with another text message indicating it was good that her pants were also not too tight because he would “get it coming and going.” Another time, in response to a comment regarding the relative infrequency of her sexual activity, Dr. Knight told Nelson, “That’s like having a Lamborghini in the garage and not ever driving it.” Dr. Knight also once texted Nelson to ask how often she experienced orgasms. While these comments would commonly be viewed as inappropriate in most any setting and, for sure, beyond the reasonable parameters of workplace interaction, they nevertheless were an undeniable part of the consensual personal relationship enjoyed by Nelson and Dr. Knight. The banter, at least, revealed a relationship that was much different than would reasonably be expected to exist between employers and employees in the workplace.
The personal relationship also lasted six months and did not end until Dr. Knight’s wife discovered Nelson and Dr. Knight were texting each other while Dr. Knight was out of state on a vacation. Dr. Knight’s wife examined phone records to discover the texting only because she had grown suspicious of the relationship between Nelson and her husband.[12]
*79 Mixed motives, of course, can support a sex-discrimination claim. See Hopkins, 490 U.S. at 246-47, 109 S.Ct. at 1788-89, 104 L.Ed.2d at 285-86. Yet, the record contained no evidence to suggest a factor other than the relationship between Nelson and Dr. Knight was a motivation for the termination or that the relationship was a pretext for a discriminatory intent.
The absence of sexual intimacy in the relationship between Nelson and Dr. Knight, and the absence of sexually suggestive behavior on the part of Nelson, does factually distinguish this case from the line of cases that do not recognize a sex-discrimination claim based on a consensual, romantic relationship. Yet, this distinction does not shift this case into the line of gender-discrimination cases that protect women from discrimination based on their physical appearance. Even if Nelson was fired because Dr. Knight was physically attracted to her, the attraction and resulting threat to the Knights’ marriage surfaced during and resulted from the personal relationship between Nelson and Dr. Knight, and there is no evidence in the summary judgment record tending to prove the relationship or Nelson’s termination were instead consequences of a gender-based discriminatory animus. Ultimately, the question comes down to whether a reasonable fact finder could find that Dr. Knight’s reasons for terminating Nelson were, even in light of the relationship, responses motivated by Nelson’s status as a woman. Courts evaluate this evidence “in light of common experience as it bears on the critical question of discrimination.” Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978).
True to our governing legal authorities, a sex-discrimination claim predicated on physical appearance accompanied by a consensual personal relationship between the employee and employer requires proof that the physical appearance of the plaintiff was a gender-based reason for the adverse employment action.[13] An adverse employment action based on a personal relationship that existed here between Nelson and Dr. Knight — or its consequences — is not actionable discrimination based on sex under our statute.
In view of the undisputed fact of a personal relationship between Nelson and Dr. Knight, Nelson has failed to engender a fact question on her claim that Dr. Knight’s decision to terminate her was motivated by her status as a woman. The relationship, even in the context of summary judgment, included enough activity and conduct to support a determination as a matter of law that Nelson was terminat *80 ed as a response to the consensual personal relationship she maintained with Dr. Knight. In the context of the personal relationship, there was insufficient evidence tending to show that Nelson’s status as a woman was also a motivating reason.
It is important to observe that a critical aspect of the entire analysis centers on the consensual and voluntary nature of the personal relationship. The law that navigates through the intersection between sex discrimination and personal workplace relationships to reach the destination of nondiscriminatory conduct requires willing participants to the relationship. Of course, a personal relationship between an employer and subordinate can give rise to subtle issues of power and control that may make the line between consensual and submissive relationships difficult to draw. See generally Billie Wright Dziech, Robert W. Dziech II & Donald B. Hordes, ‘Consensual ’ or Submissive Relationships: The Second-Best Kept Secret, 6 Duke J. Gender L. & Pol’y 83 (1999). This concern has been particularly observed in cases involving claims of sexual harassment, either hostile-environment claims or quid pro quo claims. See Ammons-Lewis v. Metro. Water Reclamation Dist., 488 F.3d 739, 746 (7th Cir.2007) (finding existence of voluntary relationship did not preclude sexual-harassment claim). Thus, the consensual aspect of a relationship is pivotal to the analysis of the claim of discrimination based on a personal relationship. In this case, it is undisputed the relationship was consensual. If it was not consensual, a turn in the analysis would occur. Yet, Nelson made no legal or factual claim that a relationship with Dr. Knight was submissive, objectionable, or harassing in any way, and there was no evidence in the record to hint the relationship was not jointly pursued. The role of consent is important to the responsibility of employees and employers of both sexes to monitor and control their conduct in the workplace.
While there is only a single standard for summary judgment, see Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir.2011); Iowa R. Civ. P. 1.981; see also Fed.R.Civ.P. 56, as a practical matter, it should be used sparingly in employment-discrimination cases. See Hon. Timothy M. Tymkovich, The Problem with Pretext, 85 Denv. U.L.Rev. 503, 519-22, 528-29 (2008). Ordinarily, employment discrimination cases generate genuine issues of material fact because they are “often fact intensive and dependent on nuance in the workplace.” Fercello v. County of Ramsey, 612 F.3d 1069, 1077 (8th Cir.2010). Yet, the claim of discrimination in this case was actually framed by Nelson without relying on inferences or conflicting evidence. In other words, Nelson did not argue that Dr. Knight’s expressed reason for terminating her was actually a pretext for an underlying discriminatory intent to terminate her based on her status as a woman. Instead, Nelson used the same reasons to show the termination was discriminatory as Dr. Knight used to show the termination was not discriminatory. She never offered an explanation for how those reasons establish a discriminatory animus. Thus, the resolution of the case turns on context: Was Nelson’s termination a response by Dr. Knight to a personal relationship or was it his response to Nelson’s status as a woman? It is undisputed the relationship existed, and Nelson failed to generate a fact question on her claim that her termination was motivated by a stereotype involving her status as a woman.
While summary judgment must be granted with caution, courts are required to grant judgment for the movant when the legal standards have been met. In this case, there was insufficient evidence *81 offered by Nelson in light of the undisputed evidence of a consensual personal relationship that would permit a reasonable fact finder to conclude by a preponderance of the evidence that Dr. Knight terminated Nelson based on her status as a woman. In the final analysis, this court has carefully considered the issue presented and has sought to understand its complexity with the seriousness and attention demanded of all cases. Research has failed to uncover any appellate court in the nation that has recognized sex discrimination under facts similar to those in this case, and it has failed to identify any state legislature that has defined sex discrimination to include adverse employment consequences from a consensual personal relationship. If, in fact, Congress or our legislature intended for adverse employment consequences from consensual personal relationships between employers and employees to be protected as sex discrimination, these legislative bodies can clarify or change the law to reflect such intent. In the meantime, our law and this court remains devoted to carrying out the important legislative goal of eradicating discrimination from society, but this case simply lacked the facts to establish discrimination. Without proof of sex discrimination, the employment-at-will doctrine followed in Iowa guides the out1 come.
WIGGINS and HECHT, JJ., join this special concurrence.

. Supporters of this view of the legislative history of Title VII often note that the federal legislation passed without any significant debate or explanation to expand on the underlying legislative intent. See, e.g., Meritor, 477 U.S. at 63-64, 106 S.Ct. at 2404, 91 L.Ed.2d at 57-58; see also N. Morrison Torrey, Indirect Discrimination Under Title VII: Expanding Male Standing to Sue for Injuries Received as a Result of Employer Discrimination Against Females, 64 Wash. L.Rev. 365, 385 (1989) (arguing the amendment to add sex to the list of discriminatory grounds went without challenge and essentially without comment, even though the bill faced months of debate in the Senate). However, there is recent authority suggesting that greater legislative history exists. See Robert C. Bird, More Than a Congressional Joke: A Fresh Look at the Legislative History of Sex Discrimination of the 1964 Civil Rights Act, 3 Wm. & Mary J. Women & L. 137, 155-60 (1997) (describing the background, history, debate, and voting on the Civil Rights Act); Cary Franklin, Inventing the "Traditional Concept” of Sex Discrimination, 125 Harv. L.Rev. 1307, 1326-29 (2012) (highlighting arguments by Representatives Martha Griffiths and Katharine St. George that adding "sex" to the Civil Rights Act would ameliorate the unfair labor environment created by so-called "protective” laws, which dated to a period in which women were considered property and severely limited a woman’s ability to obtain certain employment); Rachel Osterman, Comment, Origins of a Myth: Why Courts, Scholars, and the Public Think Title VII’s Ban on Sex Discrimination Was an Accident, 20 Yale J.L. & Feminism 409, 415 (2009) (describing the history of the Civil Rights Act in the Senate after the bill left the House of Representatives). This history could leave room to conclude Title VII was intended to address more than distinctions based on gender as it has been traditionally understood by our courts.

. In this case, the reference to personal relationships only refers to heterosexual relationships. Both Nelson and Dr. Knight are married to opposite-sex spouses, and this case is evaluated in that context.

. However, conduct constituting sexual harassment occurring after the end of a consensual, intimate relationship can violate Title VII and the Iowa Civil Rights Act. See Johnson v. West, 218 F.3d 725, 729-30 (7th Cir.2000); Walko v. Acad. of Bus. & Career Dev., LLC, 493 F.Supp.2d 1042, 1048-49 (N.D.Ill.2006); Schrader v. E.G. & G., Inc., 953 F.Supp. 1160, 1167-68 (D.Colo.1997); Babcock v. Frank, 729 F.Supp. 279, 288 (S.D.N.Y.1990); Williams v. Joe Lowther Ins. Agency, Inc., 341 Mont. 394, 177 P.3d 1018, 1024-25 (2008); see also Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir.2001).

. Nelson actually articulated several specific claims of sex discrimination. She claimed discrimination occurred because she would not have been fired if she had been a man. She also claims she was fired simply for going to work as a woman attractive to her employer. She also claims she was fired due to the discriminatory stereotype that an attractive woman who works with a married man is a threat to the man’s marriage. All her arguments, however, collapse into a single claim. For example, Nelson argues she would not have been fired if she were a man; the Knights’ marriage would not have been threatened in the same way if she were a (heterosexual) man. As to the discriminatory stereotype that attractive women who work closely with married men are a threat to the man’s marriage (derived from Jeanne Knight’s demand that Nelson be fired), a threat derived from an actual, ongoing, personal relationship is not a stereotype. Cf. Staub v. Proctor Hosp., 562 U.S. -, -, 131 S.Ct. 1186, 1193, 179 L.Ed.2d 144, 154 (2011) (holding that an employer’s stated reasons for termination must be separately analyzed to determine whether they were influenced by those of an allegedly biased supervisor). In truth, all the claims asserted by Nelson boil down to whether the relationship engaged in by Nelson and Dr. Knight supplied a nondiscriminatory reason for the termination and eliminated any reasonable inference that gender was the motivating factor.

. The summary judgment record revealed Jeanne Knight, who also worked in the office, felt Nelson flirted with her husband at work and that she was cold towards her at work. She also felt Nelson "liked to hang around after work when it would just be her and [Dr. Knight] there.” She felt Nelson also engaged *79 in attention-seeking behavior in the office and enjoyed working close to her husband.

. In determining whether the physical attraction and threats to the employer's marriage were responses to Nelson's conduct or responses to Nelson’s status as a woman, the presence of a consensual personal relationship would not typically give rise to any inferences of gender-based sex discrimination within the relationship. Indeed, inferences drawn from such a relationship and its effect on the workplace would be consistent with the opposite conclusion. See Preston v. Wis. Health Fund, 397 F.3d 539, 541 (7th Cir.2005) ("[Romantically motivated] favoritism is not based on a belief that women are better workers, or otherwise deserve to be treated better, than men; indeed, it is entirely consistent with the opposite opinion.”). For sure, romantic, sexually intimate relationships between employees and employers that have been found by courts to not support a claim of sex discrimination are often nevertheless marked by physical attractiveness and perceived threats to a marriage. See Tenge, 446 F.3d at 907; Platner, 908 F.2d at 903. Thus, a gender-based sex-discrimination claim involving a personal or sexual relationship is not established merely by evidence that an employer was sexually or romantically attracted to an employee.