## COMMONWEALTH *vs.* VICTOR FRANK.

No. 93-P-1435.

Bristol. October 12, 2000. - February 16, 2001.

Present: GREENBERG, KAPLAN, & DUFFLY, JJ.

*Practice, Criminal,* Indictment, Dismissal, Duplicative convictions. *Evidence,* Prior misconduct, Other offense. *Rape.*

At the trial of indictments for rape and sexual abuse of a child, there was no error in the judge's allowing pretrial amendments to the indictments with respect to the dates of the offenses, and there was no error in the judge's denying the defendant's motion to dismiss the indictments based on an assertion that any acts took place on dates when the defendant and victim were not in Massachusetts. [22-23]

At the trial of indictments for rape and sexual abuse of a child, evidence of the defendant's other sexual conduct toward the victim in other States was properly admissible, and the judge correctly gave limiting instructions to the jury on the use of the evidence. [23-24]

Evidence at a criminal trial amply supported the jury's conviction of the defendant on charges of rape and sexual abuse of a child. [24-25]

INDICTMENTS found and returned in the Superior Court Department on October 22, 1990.

The cases were tried before *John M. Xifaras,* J.

*Paul J. Machado* for the defendant.

*David Keighley,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. On October 22, 1990, a Bristol County grand jury returned indictments charging Victor Frank with the crimes against his stepdaughter of forcible rape of a child under sixteen years of age (G. L. c. 265, § 22A), indecent assault and battery on a child under fourteen (G. L. c. 265, § 13B), and the like crime on a person over fourteen (G. L. c. 265, § 13H). Trial by jury in Superior Court occurred in March, 1992, and the defendant was convicted on all counts. The case is here for decision on direct appeal after an unfortunate delay described in

the margin.[1] After setting out the evidence, we deal with the defendant's claims, in essence, though variously stated and argued, that the alleged offences were committed, if at all, outside the Commonwealth and were thus not subject to prosecution here.

The jury could have found the following.[2] Amy (a pseudonym) was born on February 9, 1974. She first encountered the defendant after his marriage to her mother when the family — Amy, her mother, the defendant, and two younger brothers — moved into the defendant's house in Tiverton, Rhode Island. Amy was then seven years old. The family remained there through 1984. Amy recalled an incident at age seven when the defendant asked her to kiss his stomach, then pulled down his pants and asked her to go down lower. She refused. A few days later he "cornered" her, as she said, in the kitchen, pulled down his pants and asked her to kiss his penis; when she would not do it, he held his penis to her mouth and tried to enter it. She held her mouth shut and tried to push him away.

Amy, eight to ten years old, in her parents' bed in the Rhode Island home, found the defendant on top of her trying to put his penis in her vagina.[3] He told her "to be a big girl" and let him do it, and he kept on trying, saying he would give her money if she yielded. He got his way because he was stronger. Incidents like this began to take place weekly, when Amy's mother was out; when the brothers were at home, the defendant ordered

---

[1]On June 24, 1994, this court dismissed the defendant's appeal from the Superior Court's judgment of conviction because he had failed to file a brief. On September 11, 1995, the defendant, acting pro se, filed a motion for a new trial; this was denied by the trial judge without a hearing. This court affirmed the ruling in an unpublished decision, 41 Mass. App. Ct. 1115 (1996). The Supreme Judicial Court granted further appellate review and, on the ground of inefficiency of counsel in prosecuting an appeal, remanded the case to the Superior Court for the appointment of new counsel. The Supreme Judicial Court declared the defendant would be at liberty to pursue a direct appeal or move for a new trial or do both, and the standard of review would not be "the more stringent one that applies 'once the process has run its course.' " *Commonwealth* v. *Frank*, 425 Mass. 182, 185 (1997), quoting from *Commonwealth* v. *Amirault*, 424 Mass. 618, 637, 652 n.24 (1997). Hence the direct appeal before us.

[2]Witnesses on the part of the Commonwealth were Amy, James Knight (regarding fresh complaint), the victim's maternal grandmother, and Fred Barbosa (of the Department of Social Services). The victim's mother testified for the defense.

[3]Amy testified the defendant first had intercourse with her when she was about eight years old.

them to their room. Such abuse continued after the family moved about 1984 to Florida and lived in a trailer for perhaps a year.

In June, 1985, the family settled in Swansea, Massachusetts, living first, until January, 1986, in a trailer in the front yard of the maternal grandparents' house, later in the basement of the house, and finally, in April, 1986, in a separate cottage nearby. Amy recalled with particular clarity an incident in the trailer when the defendant had vaginal intercourse with her. It was in the daytime. She remembered looking out a window "[like she] was just in another world" as if she had "removed" herself from the situation. She was eleven or twelve years old. Similar things happened a couple of times a month. By then she "was so used to it happening" that she did not fight it anymore, "there really wasn't anything [she] could do" to stop it. The defendant told her no one would believe her story; she would lose her mother if she told; he would treat her mother and brothers better (he was regularly mistreating them[4]) if she "went along" with him.

There were occasions — when she was brushing her hair, or just passing by him — when the defendant quite casually fondled her breasts and buttocks or put his fingers in her vagina.

When, at rare times, she tried to resist, her attempts were futile. Once, in the home at 12 Promenade Street, Swansea, she refused the defendant oral sex and tried to keep her legs shut, but the defendant held her legs, "had them apart," and performed oral sex on her. In that home, sometime in 1989 or 1990, when her mother and brothers were away at a family reunion, the defendant displayed two pornographic movies to her, fondled her, touched her breasts, fingered her vagina, and finally had intercourse with her.

Sometimes in 1989, when Amy was fifteen, she accompanied the defendant to the dog track in Raynham. (A few times, indeed, she asked to go with him to the track so that she could "talk him into letting [her] off" from being grounded at home.) On trips back home from Raynham, the defendant more than once stopped the car in a rest area off Route 44 and had intercourse with her on a car seat.

At intervals until about a month after her sixteenth birthday (February 9, 1990), the defendant had intercourse with her in

---

[4]Amy's maternal grandmother testified to this point.

the Swansea home. The last encounter "happened really close to [her] birthday," and she recalled thinking at the time, "Wow, what a great birthday present." Soon afterward she moved in with her grandparents in Swansea, seeing this as a chance to get away from the abuse at home.

Amy did not tell her mother; she thought her mother would not believe her. She first spoke of her situation one evening during the summer of 1988[5] to her best friend in the presence of James Knight and another boy (three high school friends). Knight testified at trial to the particulars of the disclosure: upset and crying, she said her father had been having sex with her for years, she feared it would not stop, she did not know what to do.

In July, 1990, Fred Barbosa, a social worker with the Department of Social Service (DSS), received a report calling for an investigation. Initially Amy denied her stepfather had abused her. But within a few days, she reversed course because she "just decided that [she] should tell" and thought Barbosa in any case would find out. She told her story to him in detail.

In August, 1990, the family, short of Amy, and without mention to her, abandoned their Swansea home and moved to Florida. She did not see any of them for a year.

Responding to the Commonwealth's case, consisting in substance of the foregoing account, the defense offered the testimony of Amy's mother, the defendant's wife. She said Amy at fifteen or sixteen fell in with a wrong set of friends, including a boyfriend of older age, and there were intrafamily arguments about curfew restrictions. Amy often asked the defendant to take her to the dog track, her mother testified, and never said anything about misconduct by the defendant until DSS made inquiries. Her story, said her mother, was a fiction.

1. *Motion to dismiss indictments.* As amended, the under-sixteen rape indictment charged the acts occurred at Swansea at divers times from February 9, 1984, to March 21, 1990. But it is agreed the family did not move to Massachusetts until after February 9, 1984 — in June, 1985 — and the victim attained the age of sixteen on February 9, 1990. So the beginning date precedes the family's arrival in the State; and the end date is a month and one-half after Amy turned sixteen.

---

[5]The defendant argued at trial that Amy's "complaint" was not "fresh" but he does not pursue the argument on appeal.

As amended, the under-fourteen indecent assault indictment charged acts at Swansea at divers times from February 9, 1984, to February 9, 1988. Again, the beginning date precedes the family's arrival in the State. (Amy became fourteen on February 9, 1988, the terminal date charged.)

The over-fourteen indecent assault indictment (not amended) charged acts in Swansea from February 9, 1988, to March 21, 1990. No difficulty here.

It was quite in order for the judge to allow amendments prior to trial that revised the dates of the alleged offenses. These amounted to no more than changes of form. Also innocuous were the imprecisions in the amended indictments: the defendant does not indicate his defense would have been helped or different had the indictments been more exact in the particulars mentioned. See *Commonwealth* v. *Kirkpatrick*, 423 Mass. 436, 439-444, cert. denied, 519 U.S. 1015 (1996); *Commonwealth* v. *Sineiro*, 432 Mass. 735, 737-738 (2000). There was argument that the indictments might be taken to have charged acts beyond the territorial jurisdiction of the court, but in the end, it was for the Commonwealth to establish that the defendant in fact committed the three crimes within the Commonwealth. There was no error in denying the motion to dismiss the indictments.[6]

2. *"Bad Acts."* The defendant claims the judge abused his discretion in admitting evidence of out-of-State acts of sexual abuse. How could this be squared with the limits of our criminal jurisdiction?

A portion of the evidence did indeed deal with the defendant's misbehavings toward Amy in Rhode Island and Florida before the family moved to Swansea. It was made clear this material could be received as bad acts — not in proof of the substantive offenses, but instead for the conventional collateral purposes, namely: to show a common scheme[7]; to describe the entire relationship between actor and victim, in particular how it started and developed[8]; to elucidate motive[9]; to describe a pat-

---

[6] In his territorial contention, the defendant is not helped by reference to the grand jury minutes.

[7] See *Commonwealth* v. *Barrett*, 418 Mass. 788, 793-794 (1994); *Commonwealth* v. *Hanlon*, 44 Mass. App. Ct. 810, 818 (1998).

[8] See *Commonwealth* v. *Martino*, 412 Mass. 267, 280-281 (1992); *Commonwealth* v. *Sosnowski*, 43 Mass. App. Ct. 367, 372 (1997).

[9] See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 237 (1991).

tern of conduct, negating accident or mistake;[10] to demonstrate sexual desire for the victim;[11] or to furnish corroboration of the material proof.[12] Bad acts, although occurring outside the State, may come in as ancillary to the proof of the commission of crimes within the State. See *Commonwealth* v. *Sawyer*, 389 Mass. 686, 696-697 (1983); *Commonwealth* v. *Otsuki*, 411 Mass. 218, 235-236 (1991).

The defendant protests that it would be easy for a jury to slip over the line and convict a defendant relying on the extraterritorial bad acts, while ignoring or even disbelieving the distinctly relevant local evidence. The protest has merit and emphasizes the importance of schooling the jury in the distinction they must make. (The same problem and solution occur in humbler cases of bad acts not involving State jurisdictional boundaries. Compare *Commonwealth* v. *Mills*, 47 Mass. App. Ct. 500, 504-507 [1999].) In the present case, the trial judge dealt carefully with the matter in his remarks after the Commonwealth's opening statement, and again in the formal instructions. He said the defendant was not charged with any acts that occurred in Rhode Island or Florida; the jury were not to use evidence of any out-of-State conduct "as a substitute for proof that the defendant committed the crimes charged" in Massachusetts; they could accept such evidence on "the limited issue of the relationship between the defendant and Amy" and the question whether there was "any pattern" of conduct, but not "as proof that the defendant has a criminal personality or bad character."

3. *Evidence.* In aid of his motions for required findings of not guilty, the defendant argues, first, there was no evidence of force to support the rape charge. The argument fails. The charge was amply sustained by Amy's testimony.[13]

Recall that on one occasion in Swansea the defendant, after being denied oral sex, forced the victim's legs apart and performed cunnilingus upon her. So also the evidence shows the

---

[10]See *Commonwealth* v. *King*, 387 Mass. 464, 472 (1982); *Commonwealth* v. *Fleury-Ehrhart*, 20 Mass. App. Ct. 429, 431 (1985).

[11]See *Commonwealth* v. *Calcagno*, 31 Mass. App. Ct. 25, 27 (1991). See generally Liacos, Massachusetts Evidence § 4.4.6, at 165-167 (7th ed. 1999).

[12]See *Commonwealth* v. *King*, 387 Mass. 464, 472 (1982).

[13]On appeal the evidence is viewed in a light most favorable to the Commonwealth. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979); *Commonwealth* v. *Jones*, 432 Mass. 623, 625 (2000).

victim was coerced into submitting to natural and unnatural intercourse by the defendant's threats she would otherwise lose her place in the family and cause harm to her mother and brothers. See *Commonwealth* v. *Caracciola*, 409 Mass. 648, 650-653 (1991); *Commonwealth* v. *Kirkpatrick, supra* at 444; *Commonwealth* v. *Haynes*, 45 Mass. App. Ct. 192, 201 (1998); *Commonwealth* v. *Martin*, 47 Mass. App. Ct. 240, 246 (1999).

Second, the defendant now draws attention — although he made no point of it at trial — to the possibility of duplicative convictions, with the jury basing both the rape and assault convictions on the same act. See the recent discussion in *Commonwealth* v. *Black*, 50 Mass. App. Ct. 477, 478-479 (2000).

The possibility of duplication appears insubstantial in the present case. Amy in her particularized testimony identified and distinguished the defendant's acts of indecent touching from those of intercourse with their component of penetration. See *Commonwealth* v. *Fitzpatrick*, 14 Mass. App. Ct. 1001, 1003 (1982); *Commonwealth* v. *Brouillard*, 40 Mass. App. Ct. 448, 449 n.3 (1996); *Commonwealth* v. *Black*, 50 Mass. App. Ct. at 479. And the judge instructed distinctly and clearly on the elements of each crime charged and laid emphasis on the point that the jury could find guilt as to each crime "only if you are all unanimously agreed that the Commonwealth has proved beyond a reasonable doubt that the defendant committed the crime on at least one specific occasion." See *Commonwealth* v. *Conefrey*, 420 Mass. 508, 513-514 (1995). The judge also instructed carefully and forcefully that the jury could not convict of the rape on the basis of any act postdating February 9, 1990, when the victim reached her sixteenth birthday.

We note, finally, it was the defendant's central contention, pursued by cross-examining the victim and offering the mother as a witness, that the defendant was free of any unlawful conduct and the victim's testimony was the invention of a vindictive mind. It was for the jury to speak on this proposition.

*Judgments affirmed.*