**In re C. F. SMITH & ASSOCIATES, INC., Debtor.**

**Bankruptcy No. 98–45574 JFQ.**

United States Bankruptcy Court, D. Massachusetts.

June 24, 1999.

---

Andre D. Summers, Summers Law Office, Franklin, MA, for Debtor.

## DECISION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Before the court is the sexual harassment claim of M. Kellie Beaupre McDonough (the "Claimant") against C.F. Smith & Associates, Inc. (the "Company"), a chapter 11 debtor seeking reorganization in this court. This is an unusual sexual harassment case in that it is the product of a broken affair between the Claimant and Clifford F. Smith ("Smith"), the Company's founder and president. The present procedural posture is also out of the ordinary. To promote an expeditious reorganization under competing plans, I have decided to adjudicate the claim even though a state court judgment favoring the

1. Counts II and IV through VI were grounded, respectively, on the Massachusetts Civil Rights Act (Mass. Gen. Laws ch. 12, §§ 11 H, 11I), tortious interference with advantageous relationships, defamation and intentional infliction of emotional distress. Counts II and VI were dismissed at trial on the defendants'

Claimant is on appeal blessed with relief from the automatic stay.

On January 29, 1993, the Claimant filed a complaint against the Company and Smith with the Massachusetts Commission Against Discrimination ("M.C.A.D."). Pursuant to Massachusetts General Laws chapter 151B, section 9, she thereafter dismissed her M.C.A.D. complaint and filed a more detailed complaint with the Superior Court Department of the Massachusetts Trial Court, Middlesex County (the "Superior Court"). Count I and III of that complaint, which allege sexual harassment as defined in Massachusetts General Laws chapter 151B, are the only counts that survived trial.[1]

On April 26, 1997, following a jury verdict for the Claimant and post-trial motions, the Superior Court entered judgment against the Company in the sum of $197,500 in compensatory damages, plus (i) interest from April 16, 1993 in the sum of $95,655.17, and (ii) costs and attorney fees in the sum of $175,383.61. Judgment was also entered against Smith in the same amount plus punitive damages of $87,000. The defendants immediately appealed both judgments (and a later order denying their motion to correct the record) to the Massachusetts Appeals Court.

## I. BACKGROUND OF COMPETING PLANS

Burdened with this claim, the Company filed its chapter 11 petition on July 24, 1998.[2] It listed the Claimant's debt in the sum of $293,155.17 (including $95,655.17 of prejudgment interest but no postjudgment interest) and described the debt as "contingent unliquidated," apparently because of the pending appeal. It listed the Claimant's law firm as a creditor in the sum of $175,383.61. The Company's total sched-

motion for a directed verdict. Counts IV and V were previously dismissed on the defendants' motion for summary judgment.

2. Smith has not filed an individual bankruptcy case.

uled unsecured debt, including amounts owed to its own lawyers for services in litigation with the Claimant, comes to $553,181.53. Its total scheduled secured debt is $191,270.[3]

On August 6, 1998, I denied the Claimant's motion for the appointment of a chapter 11 trustee.[4] At the same time, I modified the automatic stay to permit both the Company and the Claimant to proceed further in the appeal to the Massachusetts Appeals Court.

Skirmishing on plan filing rights soon began. On November 13, 1998, on the Company's motion and over the Claimant's objection, I extended the Company's exclusive plan filing rights to January 15, 1999. On that date the Company filed its plan of reorganization and disclosure statement. The plan proposes paying unsecured creditors a total of $75,000, in installments over 60 months, with funds to come from operations and a capital infusion of $7,500. At the hearing on approval of the disclosure statement, held on February 25, 1999, I required that various amendments be made to the disclosure statement and continued the hearing to April 9, 1999.

On February 25th the Claimant filed a motion for authority to propose her own plan. This motion was also set down for hearing on April 9th. On that date I allowed the Claimant's motion to file her plan[5] and set May 10th as the date for the hearing on approval of her disclosure statement. The Claimant's plan proposes to pay, in nine quarterly payments, 100% to all unsecured creditors except the Claimant and Smith, both of whom are to receive 50% of their claims in quarterly installments.[6] It also proposes to change the present outstanding voting shares to nonvoting shares and to issue voting shares to the Claimant for $10,000. The Claimant's plan is thus quite different from the typical creditor nonliquidating plan which simply cancels all outstanding capital stock and converts unsecured debt to stock. On April 9th I also approved the Company's amended disclosure statement but prohibited it from soliciting creditor acceptance of its plan pending approval of the Claimant's disclosure statement.

## II. ESTIMATION PROCEDURE

At the May 10th hearing on the Claimant's disclosure statement it became apparent that no meaningful plan could be proposed by either party until resolution of the Company's appeal of the Claimant's judgment. Counsel estimated that the Massachusetts Appeals Court would not be able to render a decision for perhaps a year or more. Any chapter 11 reorganization, much less one with competing plans, poses a threat to the continued loyalty of a debtor's customers and employees. To prolong that uncertainty is to invite disaster. At the May 10th hearing I therefore rejected the approach of waiting for a result from the Massachusetts Appeals Court. I ruled, without objection from the parties, that I would establish the amount of the claim by means of adjudicating the merits of the Company's appeal.

3. This includes car loan debt of $29,778, a secured bank credit line of $59,500 and $79,200 owed to Smith. Smith is the Company's landlord; his collateral is curiously described as "18 months at $4,400–month Rental Agreement."

4. This motion was later renewed and again denied on December 11, 1998.

5. I construed the Company's prior motion for an extension of plan filing rights and the court's endorsement order allowing it as an extension of only the 120 day exclusive plan filing period and not the 180 day period. *See*

11 U.S.C.S. § 1121(c)(3) (Law.Co-op.1987 & Supp.1998). I further ruled that even if the Company still had exclusive plan filing rights there was sufficient reason to terminate those rights and allow the Claimant to file a competing plan.

6. The Claimant has not as yet sought to subordinate Smith's claim to her claim under principles of equitable subordination, which if accomplished would result in the assignment of Smith's claim to her to the extent necessary to pay her claim in full.

The appendix and briefs that had previously been filed with the Appeals Court were thereafter filed here and I have since heard arguments on the appeal.[7] At the argument I informed counsel I would estimate the claim without further trial if I concluded that under Massachusetts law the judgment should be reversed and a new trial ordered. I said I would make the estimation based upon a thorough examination of the appendix, which includes a transcript of the entire trial. I take that tack because this court's docket is sufficiently full to prohibit the holding of even a "mini-trial" until 2000. This is a delay which would obviously frustrate the very purpose of estimating the claim pursuant to section 502(c) of the Code—to facilitate an early reorganization.[8]

As shall be seen, I conclude that the Superior Court committed no prejudicial error. But the issues raised in the appeal are not without complexity. If the decision here is appealed, an appellate court may take a different view, reversing and remanding for me to fix and liquidate the claim under an appropriate estimation procedure. That entire process would consume so much time as to be the likely death knell for this reorganization. A decision on the merits of the appeal has required this court to review virtually the entire trial transcript. I may as well review what little of the appendix is left for review and make a decision now on the facts and law de novo. A decision based on this approach would then presumably be entitled to the discretion, discussed below, which is afforded a bankruptcy court's allowance of a claim based upon an estimation procedure. Part IX of this decision contains that approach.

In establishing the merits of the Company's appeal, by in effect sitting as the Appeals Court, I am adjudicating the claim through usual legal process rather than by estimating its value through an abbreviated process. And yet this is obviously not normal appellate procedure because no appeal is pending here. My authority to adjudicate the appeal rests in section 502(c), which grants bankruptcy courts broad discretion. *See, e.g., Bittner v. Borne Chem. Co., Inc.,* 691 F.2d 134 (3d Cir.1982) (approving as a sound exercise of discretion estimation of claim at zero, with merits of claim to be established postconfirmation, even though this in effect denies debtor's right to discharge claim). A section 502(c) estimation is often employed for purposes other than adjudicating the merits of claim, such as to establish voting rights or determine a plan's feasibility. *See, e.g., Kane v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 843 F.2d 636, 646–48 (2d Cir.1988); *In re Farley, Inc.,* 146 B.R. 748 (Bankr.N.D.Ill.1992); *In re MacDonald,* 128 B.R. 161 (Bankr. W.D.Tex.1991). In some cases courts have estimated the value of a claim for all purposes, including distribution, but have done so only on a temporary basis while expressing a willingness to reconsider the claim for "cause" under section 502(j)[9]

---

**7.** At the argument the question of resolution of the Claimant's claim against Smith was raised. Because he is not a debtor before me, I observed that my jurisdiction to adjudicate this claim was questionable at best. But I offered to act as arbitrator on the claim if both parties desired me to do so and thereby entirely avoid the Appeals Court process. Neither party embraced this approach. So I deal here only with the Claimant's rights vis-a-vis the Company.

**8.** Section 502(c) of the Code provides in part:

There shall be estimated for purpose of allowance under this section ... any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case ...

11 U.S.C.S. § 502(c) (Law.Co-op.1995 & Supp.1998).

**9.** Section 502(j) provides as follows:

A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a

when its merits are finally adjudicated by the nonbankruptcy forum before which it is pending. *See, e.g., In re Lane,* 68 B.R. 609 (Bankr.D.Hawai'i 1986). That strikes me as an unnecessary duplication of effort and an unwise prolonging of uncertainty. The merits of a claim may be finally adjudicated under an estimation procedure. *See, e.g., Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.,* 54 F.3d 406 (7th Cir.1995). Here too the bankruptcy court is afforded a measure of discretion. *See, e.g., Addison v. Langston (In re Brints Cotton Mktg., Inc.),* 737 F.2d 1338 (5th Cir.1984) (approving bankruptcy court's use, for the sake of simplicity, of filing date as applicable date for fixing damage claims under "on-call contracts," even though this deviated from contract principles).[10]

I now turn to the first task at hand—to estimate, for all purposes, including distribution and voting, the Claimant's claim against the Company by means of adjudicating the merits of the Company's appeal.

## III. FACTS

One of the Company's grounds for appeal is alleged error by the Superior Court

in its denial of the Company's motions for a directed verdict and for judgment notwithstanding the verdict. I therefore summarize the evidence in the light most favorable to the Claimant. *See Chase v. Roy,* 363 Mass. 402, 294 N.E.2d 336, 337 (1973).

It was a May and December affair. When it began, in February of 1989, the Claimant was 27 and recently divorced with two young children. Smith was a grandfather who had children older than the Claimant and was in the process of separating from his wife of 31 years. The Claimant was attractive, bright and ambitious. Smith was aggressive, self-assured and successful. They met through the Claimant's employment with the Company, which is a sales representative for some thirty manufacturers of auto parts and auto products, one of the largest of its kind in New England. Smith is the Company's founder and president. At the time of the events here he was the owner of 90% of the Company's capital stock (two salesmen owned 5% each). Smith enjoyed a handsome income, as much as $604,000 in 1992, including compensation and rent from the Company. The Claimant's compensation

holder of an allowed claim on account of such allowed claim that is not reconsidered, but if a reconsidered claim is allowed and is of the same class as such holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder. This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

11 U.S.C.S. § 502(j).

**10.** *See also In re Aspen Limousine Serv., Inc.,* 193 B.R. 325 (D.Colo.1996) (holding court should choose best method for estimation in light of particular circumstances and affirming bankruptcy court's choice of hearing through offers of proof); *In re Seaman Furniture Co.,* 160 B.R. 40 (S.D.N.Y.1993) (affirming bankruptcy court's decision to adopt nonbinding arbitral decision previously rejected

by one party); *In re Eagle Bus Mfg., Inc.,* 158 B.R. 421 (S.D.Tex.1993) (providing a full evidentiary hearing); *In re Evans Prods. Co.,* 60 B.R. 863 (S.D.Fla.1986) (stating bankruptcy court has broad discretion in choosing best method and declining to dictate appropriate method); *In re Windsor Plumbing Supply Co.,* 170 B.R. 503 (Bankr.E.D.N.Y.1994) (holding judges must fashion their own procedures in estimating claims and deciding to multiply number of possible recovery values by probability of their occurrence); *In re MacDonald,* 128 B.R. 161 (Bankr.W.D.Tex.1991) (using abbreviated trial procedure); *In re Federal Press Co.,* 116 B.R. 650 (Bankr.N.D.Ind.1989) (estimation methods include accepting claim at face value, estimating claim at zero and waiving discharge of claim, arriving at court's independent estimation of claim, or utilizing jury trial to obtain accurate estimation, and choosing to make an independent estimation); *In re The Bible Speaks,* 65 B.R. 415, 427 (Bankr.D.Mass.1986) (requiring "something approaching a complete trial with limited discovery"); *In re Baldwin–United Corp.,* 55 B.R. 885 (Bankr.S.D.Ohio 1985).

rose from $30,000 in 1989 to $45,000 in 1992, when she was the Company's office manager and handled additional sales responsibilities.

The affair lasted about three years, with each maintaining separate households. Smith broke it off several times, for short periods, saying he was too old for her and would not get a divorce.[11] She accepted these hiatuses. She recognized that Smith was not interested in spending time with her children, and this increasingly bothered her. She wanted marriage and a father for her children.

Finally, in late May of 1992, the Claimant told Smith she was ending the relationship once and for all. He did not take it well, refusing to speak to her at the office for a few weeks. He then tried buying her back, lavishing her with presents and privileges, including $10,000 for a down payment on a home she never bought,[12] a gold necklace and a Company car. But by then there was no possibility of salvage. She was beginning to fall in love with Joseph McDonough, a young employee at ADAP Auto Palace, the Company's best customer, whom she started dating in late May of 1992. She did not tell Smith of McDonough. In June and July of 1992, Smith drew the Claimant into numerous conversations, both in and out of the office, about their relationship. None of the conversations went anywhere. Smith would say he wanted to work toward a lasting relationship. He occasionally spoke of marriage, of them living in a new home and of her children going to private school. Knowing he did not really want marriage, the Claimant gently but firmly rejected these overtures. Smith took her on a business dinner to Providence, later booking one room for the two of them rather than the two rooms she had requested. They stayed overnight without having sexual relations. By early July, the Claimant began to feel her job was in jeopardy. By then, also, she and McDonough had a sexual relationship.

On July 27, 1992 Smith found out about McDonough from McDonough's boss, who was a good friend of Smith. He flew into a rage. Calling the Claimant into his office, Smith pounded on the desk and yelled obscenities at her. She suffered through this in tears, neither admitting nor denying Smith's accusations. He told her he was taking away her sales duties, the Company car and her responsibilities as office manager. On July 29th they met outside the office. Smith demanded that she sign a letter saying she was taking a leave of absence from the Company. She refused, on the advice of counsel. At his insistence, she stayed out of the office. After a few days he ordered her back and she returned, telling Smith she wanted her old duties back.

Smith soon took away her check signing-authority and her keys to the Company's office, mouthing more obscenities and telling her to end her relationship with McDonough. He later relented somewhat. Although not changing the restriction on her duties, he gave her back the keys and told her she could have a car if she did "the right thing" and tried to "work things out" with him. The Claimant again told Smith that their affair was over, that she wanted her old duties back and that she was not going to stop seeing McDonough. He handed her the keys in front of other employees, embarrassing her.

There were about six occasions in August in which Smith called her into his private office, harangued her about McDonough and caused her to break into tears. At meetings originated by Smith, three or four similar confrontations took place outside the office during this same period. Because of this pressure from Smith and her restricted duties the Claim-

---

11. Smith was finally divorced from his wife in 1996. She and Smith now each hold a 37–½ % stock interest. Employees own the remaining 25%.

12. At Smith's request, she returned the $10,-000 to him in September of 1992.

ant was able to do little work the entire month. One of these meeting occurred at a park near the Company's office in Marlborough. Smith told the Claimant that he could put her situation at the Company "back together" if she "could work on our personal relationship." She told him, once again, that she was not going back to him and their relationship was over. He was "aggressive, pleading." She cried.

Smith met with McDonough in August and demanded that he not see the Claimant. He told McDonough the Claimant was going to be once again his girlfriend. Caught between Smith and his boss, McDonough agreed.

In late August, Smith went on a hunting trip to Newfoundland. Before he left, the Claimant, at his request, met him in a parking lot outside a restaurant in Wayland. They had an angry exchange while seated in Smith's car. He told her not to see McDonough while he was gone. She said that was none of Smith's business.

When Smith returned on September 1st he learned the Claimant had seen McDonough in the interim. On September 3d Smith and the Claimant met outside the office again. It was another stormy session. He told her she was fired. He offered her 8 weeks severance pay. The Claimant said she wanted 12 weeks severance, and Smith agreed. She signed a resignation letter which Smith had prepared and left the Company's employ that day. Smith fired her because she refused to renew their relationship, not because, as he claimed at trial, she had violated (nonexistent) Company policy against dating the employee of a good customer.

The Claimant was distraught. She saw the end of what she believed was a promising career in the "auto after market." She

decided to sleep with Smith to get her job back. She called Smith and invited him to lunch on October 8th. They had drinks and then went to Providence, where Smith had a pre-arranged business dinner. She had sexual intercourse with Smith that night at a hotel in Providence, the first time since the previous April. They talked about her joining him on a trip he had planned to Savannah.

The next day she realized, once again, that the relationship was hopeless. She was overcome with guilt for having two-timed McDonough. After two sleepless nights, she went to Leonard Morse Hospital for psychiatric treatment. When in mid-October she told Smith the affair was over, he immediately cut off her severance pay. Her M.C.A.D. complaint and Superior Court suit followed a few months thereafter. At the time of the trial she was engaged to McDonough. They have since married.

## IV. SUFFICIENCY OF EVIDENCE OF SEXUAL HARASSMENT

The Company contends the foregoing evidence is insufficient to support the jury's verdict of sexual harassment under chapter 151B.[13] For this reason, the Company says, the Superior Court committed error in denying the Company's motions for a directed verdict and for judgment notwithstanding the verdict.

Section 4 of chapter 151B makes it an unlawful practice "[f]or an employer, personally or through its agents, to sexually harass any employee." Mass Ann. Laws ch. 151B, § 4 (Law.Co-op.1989 & Supp.1998). The term "employer" does not include an employer with fewer than six persons within its employ. *See* Mass.

---

13. Counts I and III, the two counts that went to the jury, are similar. Count I alleges a violation of chapter 151B. Count III alleges a violation of section 1C of chapter 214, which provides in part: "A person shall have the right to be free from sexual harassment, as defined in chapter one hundred and fifty-one B and one hundred and fifty-one C." Mass.

Ann. Laws ch. 214, § 1C (Law.Co-op.1986 & Supp.1998). The exclusive remedy for sexual harassment is under the comprehensive scheme of chapter 151B, which cannot be bypassed by suit brought only under chapter 214, section 1C. *See* Green v. Wyman–Gordon Co., 422 Mass. 551, 664 N.E.2d 808 (1996).

Ann.Laws ch. 151B, § 1 (Law.Co-op.1989 & Supp.1998). The Company had six or more employees at all relevant times.

The term "sexual harassment" is defined as follows:

> The term "sexual harassment" shall mean sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. Discrimination on the basis of sex shall include, but not be limited to, sexual harassment.

*Id.* at § 1.

This express prohibition against sexual harassment was added to chapter 151B in 1986. *See* 1986 Mass. Acts 588. The following year, in a case not controlled by the amendment, the Supreme Judicial Court of Massachusetts construed the chapter's prohibition against discrimination based on sex to include prohibition of sexual harassment. *See College–Town v. Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 508 N.E.2d 587 (1987). In applying the ban against such discrimination, the court looked for guidance, but without binding effect, to the many federal decisions interpreting similar provisions in Title VII of the Civil Rights Act of 1964. *See id.* at 591; *see also* 42 U.S.C. § 2000e–2(a)(1) (Law.Co-op.1989 & Supp.1998). I therefore do the same.

The chapter 151B definition of sexual harassment includes both types of sexual harassment banned by Title VII:(i) sexual conduct which involves the conditioning of employment, called *quid pro quo* harassment, and (ii) sexual conduct which, although not affecting economic benefits, creates a hostile or offensive working envi-

ronment, so-called hostile environment harassment. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 62–5, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In applying Title VII, federal courts have in turn been influenced by the Guidelines of the Equal Employment Opportunity Commission. *See id.* at 65, 106 S.Ct. 2399.

■ Unlike the many cases involving hostile environment harassment where the employer's vicarious liability has been contested, *see, e.g., College–Town* (employer held liable for hostile environment created by sexual conduct of supervisor), there is no question here of the Company's liability for Smith's conduct if that conduct amounts to sexual harassment. As the Company's chief executive officer and controlling shareholder, Smith was in essence the Company acting with full authority. Nor is there any question of the Claimant having complied with the requirement that she file a complaint with the M.C.A.D. before taking court action. *See* Mass.Ann. Laws ch. 151B, § 9 (Law.Co-op.1989 & Supp.1998); *Green v. Wyman–Gordon Co.*, 422 Mass. 551, 664 N.E.2d 808 (1996) (dismissing complaint for failure to file prior complaint with M.C.A.D.).

■ The jury's verdict was a finding, simply, that the Company was liable for "sexual harassment," with no specification that Smith's conduct was *quid pro quo* harassment or hostile environment harassment, or both. There was ample evidence to support a finding of quid pro quo sexual harassment. In the words of the statute, Smith, both "explicitly and implicitly," made "submission to or rejection of ... [sexual] advances ... a term or condition of [the Claimant's] employment" as well as "a basis for employment decisions." Indeed, he did so twice. He first drastically reduced the Claimant's duties when she refused to continue their affair and stop seeing McDonough. And later, when she persisted in this decision, he fired her.

 For conduct to amount to sexual harassment of the hostile environment variety it must be sufficiently pervasive to alter the conditions of employment and create an abusive working environment. *See College–Town,* 508 N.E.2d at 591; *see also Meritor Sav. Bank,* 477 U.S. at 67, 106 S.Ct. 2399. This means an environment which meets a two-fold standard—one which a reasonable person would find abusive and one which the victim perceives to be abusive. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). It is not necessary, however, that the environment have such a psychological impact on the victim as to destroy her emotional stability or seriously affect her psychological well-being. *See id.* at 22, 114 S.Ct. 367. It is sufficient that the environment is such as would be reasonably perceived, and is perceived by the victim, as hostile or abusive. *See id.* The court should examine all the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating or amounts only to offensive utterances, and whether it unreasonably interferes with the employee's work performance. *See id.* at 23, 114 S.Ct. 367.

 The conditions which the Claimant suffered through in August of 1992 certainly meet these criteria. On about seven occasions, four in the office, Smith engaged her in lengthy sessions during which he shouted at her about her sexual relationship with McDonough and demanded that she re-establish her relationship with him. She suffered through these sessions in tears, maintaining that she had a right to her own life. This was enough to make her working environment pervasively hostile. But there was more. Smith reduced her authority and duties. He terminated her function as office manager and took away her check signing authority, sales duties and Company car, leaving her with virtually no duties. He did this to add weight to his demand that they once again become lovers. During the entire month of August there was no way the Claimant could work without having that demand in mind.

 A complaint must be filed with the M.C.A.D. "within six months after the alleged act of discrimination." Mass.Ann. Laws ch. 151B, § 5 (Law.Co-op.1989). A subsequent court complaint has to be filed "not later than three years after the alleged unlawful practice occurred." Mass. Ann. Laws ch. 151B, § 9. The Company contends the six month requirement has not been met here. It notes that the incident of July 27, 1992 occurred more than six months prior to the Claimant filing her complaint with the M.C.A.D. on January 29, 1993. This means, says the Company, that the Superior Court should not have given the jury the claim of a hostile environment sexual harassment. I disagree. As discussed, Smith's conduct during August and the Claimant's resulting working environment provided ample grounds for a finding that this form of sexual harassment had occurred during that month. Moreover, the August conduct constituted a continuing violation of Smith's hostile environment harassment of July 27th. This brings his conduct of that date within the six month period as well. *See, e.g., Lynn Teachers Union, Local 1037 v. Massachusetts Comm'n Against Discrimination,* 406 Mass. 515, 549 N.E.2d 97, 100–01 (1990); *see also Underwood v. Digital Equip. Corp., Inc.,* 576 F.Supp. 213, 215 (D.Mass.1983); *Fitzgerald v. New England Tel. & Tel. Co.,* 459 F.Supp. 996, 997 (D.Mass.1978).

 For conduct to constitute sexual harassment, it is of course necessary that it be unwelcome to the complaining party. *See Meritor Sav. Bank,* 477 U.S. at 68, 106 S.Ct. 2399. Sexual advances are unwelcome if the complainant indicates they are, even though she later participates in sexual activities in a manner that could be called voluntary. *See id.*

The Claimant told Smith on numerous occasions that she did not want to resume

their relationship and that she refused to stop seeing McDonough. In doing so she certainly indicated that Smith's advances were unwelcome. The Claimant's evidence, taken as true for these purposes, was that the first (and last) time she and Smith had sexual intercourse after April of 1992 was on October 8, 1982.[14] That was after she was fired.

■ In summary, there was ample evidence for the jury to find either or both forms of sexual harassment. The presence of one does not exclude the presence of the other. See Ellerth v. Burlington Indus., Inc., 102 F.3d 848, 855 (7th Cir.1996), aff'd, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 782 (1st Cir.1990); Carrero v. New York City Hous. Auth., 890 F.2d 569, 579 (2d Cir.1989).

The existence of a prior sexual relations between Smith and the Claimant certainly does not bar further relations from being unwelcome to the Claimant. The Company does not contend otherwise. Nor does it contend the jury had insufficient evidence to find Smith's advances unwelcome. The Company instead says, as I understand the argument, that conduct motivated by ill will emanating from a broken affair is not, as a matter of law, sexual harassment. It cites Huebschen v. Department of Health & Social Servs., 716 F.2d 1167 (7th Cir.1983). But the background to the plaintiff's employment discharge in Huebschen is quite different from the facts here. The defendant in that case was not insisting on the continuance of the parties' relationship. To the contrary, the defendant became unfriendly to the plaintiff and ended the relationship. The defendant, who was the plaintiff's supervisor, thereafter caused the plaintiff's discharge. While acknowledging that this conduct was spiteful, the Huebschen court held it was not a violation of the equal protection clause because it was prompted by ill feelings rather than discrimination based on sex. Thus Huebschen is of no aid to the Company for two reasons. It dealt with the equal protection clause, rather than the analogue of chapter 151B, Title VII, and it involved no continued demands for sex. Although Campbell v. Masten, 955 F.Supp. 526 (D.Md.1997), also cited by the Company, is a Title VII case, the defendant there had made no continued demands.

The Company also relies on Keppler v. Hinsdale Township High Sch. Dist. 86, 715 F.Supp. 862 (N.D.Ill.1989). In Keppler, the defendant, who had a prior consensual affair with the plaintiff, voiced criticism of the plaintiff to the plaintiff's supervisor and thereby precipitated her discharge. The Keppler court, for which Huebschen was binding precedent, read Huebschen to hold that "when an employer penalizes an employee after the termination of a consensual relationship, a presumption arises that the employer acted not on the basis of gender, but on the basis of the failed interpersonal relationship—a presumption rebuttable only if the employee can demonstrate that the employer demanded further. sexual relationships before taking the action he did." Id. at 869. Even if that was the holding in Huebschen, which it was not, the Keppler court glosses over the fact that the parties' relationship in the case before it soured after the defendant angrily demanded (outside the office) that their sexual relationship continue, and the plaintiff refused. See id. at 865. The court notes that the defendant had not abused or harassed the plaintiff at the office. This is relevant to a hostile environment claim but certainly not a quid pro quo claim. Beyond misreading precedent, Keppler is therefore simply wrong. The correct view is taken in Llampallas v. Mini–Circuits, Lab, Inc., 163 F.3d 1236 (11th Cir.1998). The court there observed that a supervisor's de-

---

**14.** With strained credibility, Smith testified sexual relations continued throughout the summer of 1992.

mands for the resumption of a prior sexual relationship with the plaintiff, accompanied by threats of firing if the plaintiff does not accede to the demands, constitutes sexual harassment justifying employer liability when the employer knows of the demands at the time of the firing. *See id.* at 1247.

## V. TESTIMONY OF DR. ANDREW COMPAINE

Andrew Compaine, M.D., a psychiatrist, treated the Claimant during her brief stay at Leonard Morse Hospital in October of 1992. He also saw her at his office on 33 occasions between October of 1992 and May of 1996.

Dr. Compaine testified, over the Company's objection, as follows:

Q. Dr. Compaine, do you have an opinion within a reasonable degree of medical certainty, as to the causal relationship between the events that Kellie Beaupre reported to you, leading up to her termination from employment from Cliff Smith & Associates in 1992, and her mental and emotional condition during that time?

A. Yes.

Q. What is that opinion?

MR. STEIN: Objection

THE COURT: It's overruled. The witness may answer that question.

A. It is my medical opinion that Kellie presented in October of '92 with prominent depressive symptoms and some symptoms of anxiety, and that these were a direct result. There was a causal connection with the events that had happened between her and Cliff Smith that summer including demotion, loss of her job, and harassment.

Q. And Doctor, do you have an opinion within a reasonable degree of medical certainty as to the causal relationship between the events that Kellie Beaupre had reported to you following her termination from employment from Cliff Smith & Associates in 1992

and of her mental and emotional conditions during that time?

A. Yes.

Q. And what is that opinion?

MR. STEIN: Same objection, Your Honor.

THE COURT: It's overruled. You may answer the question.

A. It's my medical opinion that Kellie Beaupre, during the time I continued to see Kellie Beaupre, she continued with some depressive symptoms, with some anxiety, as well she exhibited symptoms of post-traumatic stress in terms of: Being terrified, feeling Cliff was following her, feeling that maybe that a letter would be sent to her new employer. She's going to lose her job.

I think that those were all symptoms of post-traumatic stress as well as depression and anxiety. And I think these were a direct result of the ongoing harassment that was occurring from Mr. Cliff Smith.

Q. And Dr. Compaine, do you have an opinion within a reasonable degree of medical certainty as to how Kellie Beaupre's own behavior contributed to her condition when she took herself to the emergency room in October of '92?

A. Yes.

Q. What is that opinion?

MR. STEIN: Objection

THE COURT: It's overruled.

A. It's my medical opinion that Kellie Beaupre's own behavior was not responsible for her emergency room visit or her presentation to my office. I think that although she called Cliff Smith and went to see him in Rhode Island and had intercourse with him, as she reports, I don't believe that this was free will. I don't believe that this was a choice that she needs to pay the consequences.

I believe that this was in the context of an abusive relationship where she was backed up against the wall and

felt that she had no other choice but to try somehow to salvage her career, and her living, and get her kids back with her and all of that.

Q. And Dr. Compaine, do you have an opinion within a reasonable degree of medical certainty as to the long-term impact on Kellie Beaupre of the events reported to you by Kellie Beaupre involving her employment at CSA and her relationship with Cliff Smith?

A. Yes, I do.

Q. And what is that opinion?

MR. STEIN: Same objection, Your Honor.

THE COURT: It's overruled. You may answer the question.

A. It's my medical opinion that—and this is based on what do I see in people who have gone through a traumatic event with an abusive partner—it's my opinion that there will be long-term effects. We've already seen some. She's going to have an antenna up for any way in which she feels that there's sexual harassment going on; and those things will rekindle her fear, her upset and get her really going maybe more than other people. A fire in her belly about that.

I think that Kellie is going to continue to—it's going to get better over time but she's going to continue to be fearful. She felt fearful for her life during these years that I saw her. And she's still fearful that Mr. Smith could hurt her, that her life is danger, that her career's in danger, that her kids are in danger.

I think it affects her ability to form trusting relationships with men, period or let herself get close to men. I think her self esteem suffered terribly. I think she's felt terrible about herself for having had a relationship with her boss. And I think that any abusive relationship makes a woman feel terrible about herself because that's the way the relationship works;

and that doesn't get better right away. So, I think there are long-term effects.

### Nondisclosure of Dr. Compaine as Expert

The Company contends the Claimant's use of Dr. Compaine as an expert witness for these opinions constituted trial by ambush. It particularly complains about Dr. Compaine's testimony concerning the Claimant's "abusive" relationship with Smith and her lack of "free will" to resist. In response to an interrogatory, the Claimant had said she had not retained any experts. She did not supplement this answer prior to trial. In the parties' joint pretrial memorandum, filed in January of 1996, when called to disclose expert witnesses the Claimant stated "None." Because of this misdisclosure and nondisclosure, says the Company, Dr. Compaine's opinion testimony should have been excluded, citing *DiBiase v. Town of Rowley*, 33 Mass.App.Ct. 928, 598 N.E.2d 690 (1992) (approving exclusion of alternate land use plan which had not been disclosed by supplement to discovery request); *Kearns v. Ellis*, 18 Mass.App.Ct. 923, 465 N.E.2d 294 (1984) (approving exclusion of expert witness testimony when party had previously indicated she would have no experts and furnished name of expert only two days before trial), *rev. denied*, 393 Mass. 1102, 469 N.E.2d 830 (1984).

■■■ The decision of a trial judge on exclusion of evidence will not be disturbed, absent a showing of prejudicial error resulting from abuse of discretion. *See Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 822 (1991). Here, if there was abuse of discretion, it was not prejudicial error. This is so for several reasons.

In the first place, Dr. Compaine had previously testified, without objection and in nonopinion form, of the Claimant's "abusive relationship" with Smith. That testimony was as follows:

Q. Can you clinically explain that behavior, Doctor?

A. Well, from what I understood with Kellie that first session and subsequently, I took it that Kellie was feeling desperate. That she had worked twelve years, and worked her way up from basically a secretary to doing sales work and making a good living. And she was proud of that, and all of her friends were in that business.

And she couldn't figure out how to deal with the dilemma that if she was going to break off with Cliff Smith, that she was going to lose her career. And she couldn't imagine how she could exist without that career. She was desperate. And I think it's also common that for women in an abusive relationship to go back and forth.

I think she thought, maybe I'll give it another go. Maybe I'll see whether I can sleep with him and try to make it work again because I need my career back.

. . . . .

Q. And what was your clinical picture at that point in time?

A. That Kellie reminded me of the patients I have treated who had been in abusive relationships and are now trying to end the relationship. That the picture that she presented: Agitation, depression, feeling as if she can't exist one way and can't exist the other way, that she's backed into a corner and she's terrified what's going to become of her life, is a picture that I've seen in abusive relationships. And it seemed to me that she was—that her depression was in the context of this terrible situation she found herself in.

Q. When you use a word, "current relationships," what are you referring to?

A. I think I used the term relationship referring to her romantic involvement with Cliff Smith. Is that what you're—

Q. Yes. You used the word relationship. I'm asking you, could you define for us the nature of the relationships that you're describing between Kellie Beaupre and whom?

A. It seemed to me that she fit the picture of an abusive relationship. And that relationship, as she described it, would have been between herself and Cliff Smith. And she was now caught in the corner of being the abused woman who has low self esteem and feels dependant on the more powerful man and feels that she can't exist by herself.

. And she's trying to break off the relationship with a man who's more powerful. And in this case, he's more powerful because he's big in her industry; and he happens to be her boss and he holds that over her.

Other considerations indicate the error was nonprejudicial. Dr. Compaine's opinion testimony concerning the Claimant's lack of free will pertained to the parties' sexual liaison of October 8th, which was over a month after the events forming the basis of the claim. So the testimony did not harm the Company on the question of whether sexual harassment had occurred. Testimony that Smith's conduct was the cause of the Claimant's condition was relevant on damages. But, as Dr. Compaine made clear, his opinion on causation was based solely on what the Claimant said to him, which reduces the weight of his testimony.

Moreover, Dr. Compaine had already given much the same testimony, without objection, often in the form of giving his "impression." Some of this has been previously quoted. Consider also the following:

Q. You indicated that precipitants are a component of a full psychiatric exam; did you discuss with Kellie Beaupre at that time the precipitants to her illness?

A. Yes, I did.

Q. What does precipitants mean in the context of psychiatric exam?

A. It means in simple terms, what I was saying before, the why now? Why is someone coming to my office? Are they someone who has a depression on that one end of the spectrum; where it comes out of the blue? Or do there seem to be stresses, and how major are the stresses; and do these stresses seem to explain the degree of symptoms that the patient has?

That's something that I have to wrestle with all along when I'm working with a patient and it starts in the initial session.

Q. Did you identify certain precipitants during the course of your conversation with Kellie Beaupre?

A. Yes, I did.

Q. And what were those?

A. That Kellie felt that she was in a corner. She had broken off her relationship with her boss, Cliff Smith. And she wanted to continue to have that relationship over. And yet, she had been told, in no uncertain terms, that that meant that she was going to lose everything she had, her career, her job. And that she might not even be able to ever get a job in that field. And that she was terrified about what is she going to do. People get stressed when there's a dilemma that they can't get out of. You know, I want to break up with him. I have to break up with him because I'm with Joe. And if I stay broken up with him, I'll have no career; and I'll have no future and what do I do? I think that was the stress that Kellie was under.

. . . . .

Q. As a result of this examination, you told us that you form an impression; is that a technical term, Doctor?

A. I think you might find it in psychiatric text books. Yeah, impression or formulation.

Q. What does it mean to make an impression?

A. Kind of the way you would use the word. It means it's my impression at the end of the initial evaluation, as to what I think is going on. It answers the question that I said: Why now? Why did this woman come to my office now saying that she needs help?

Q. And what was your impression of Kellie Beaupre at the time your initial exam?

A. My impression was that she had a lot of depressive symptoms. And that these symptoms had occurred in the context of what sounded to me like a terrible ordeal of trying to break off the affair with her boss and subsequently losing her job, and fearing the loss of her career if she continued in her resolve to break off this relationship.

Q. You use the word, "depressive symptoms." What were her depressive symptoms at that time?

A. Crying, unable to sleep, eating less. I think she had decreased appetite. Unable to concentrate, couldn't enjoy anything, feeling helpless and hopeless. I guess that's what I meant.

. . . . .

Q. When she came back to see you in July of 1993, did you form an impression regarding her condition then?

A. Yes.

Q. What was your impression?

A. I felt that Kellie was doing considerably better then when I'd seen her in October, but that she was still suffering from some depression and some anxiety; and she was still quite stressed by the various factors in her life. Namely, that she still felt like she hadn't been able to resolve her problem with how is she going to go on with her career, and how was she going to be free of what she described as this harassment.

One final consideration takes any remaining sting from this opinion testimony. The Company had previously deposed Dr. Compaine. It thus had the opportunity to

draw from him his entire treatment, diagnosis and "impressions" of the Claimant. To be sure, he was not deposed as a potential expert witness. But, as we have seen, that distinction can become blurred.

In sum, notwithstanding the nondisclosure, allowance of Dr. Compaine's opinion testimony caused no prejudice. The jury had in essence already heard this evidence, and the Company through the witness's deposition had had much the same opportunity.

### Other Compaine Testimony

The Company in its brief lodges a number of other complaints about the Compaine testimony, not all of which are easy to comprehend. It says, first of all, that Dr. Compaine breached ethical canons. According to the Company, psychiatric guidelines state psychiatrists should "generally avoid agreeing to be an expert witness to perform evaluations of their patients for legal purpose because a forensic evaluation usually requires that other people be interviewed and testimony may adversely affect the therapeutic relationship." The Company offers no legal authority stating that violation of such a medical guideline makes the evidence inadmissible. Nor does it suggest Dr. Compaine interviewed others in preparation for his testimony, or that the testimony adversely affected his relationship with the Claimant. Indeed, the testimony of both indicates otherwise.

The Company says, vaguely, that "a merger of the roles of clinical and forensic expert is fraught with legal problems." But the only authority it cites are decisions holding it is reversible error to permit a doctor to give testimony which endorses the truth of the testimony of a party or a criminal complainant. See Commonwealth v. Spear, 43 Mass.App.Ct. 583, 686 N.E.2d, 1037, 1044–45 (1997); Commonwealth v. Allen, 40 Mass.App.Ct. 458, 665 N.E.2d 105, 110 (1996), rev. denied 423 Mass. 1104, 667 N.E.2d 1159 (1996); Commonwealth v. Brouillard, 40 Mass.App.Ct. 448, 665 N.E.2d 113 (1996). The opinions given by Dr. Compaine were just that—his opinions. Although consistent with the Claimant's testimony, they were far from a flat endorsement of that testimony.

■ The Company offers yet another reason for the exclusion of this opinion evidence. It says the testimony lacked foundation because no probative evidence was admitted to provide a basis for the doctor's "clinical picture" of the Claimant's "abusive relationship," or of his opinions on the cause of her condition. As a result, the Company maintains, the opinions were pure conjecture. I disagree. Dr. Compaine's opinions were based upon his numerous sessions with the Claimant. That the information he gained to form his opinions came largely from the Claimant does not destroy their worth. To the contrary, these sessions were a necessary basis for the opinions, just as a physical examination is a necessary preliminary to an opinion in other medical fields.

Moreover, undermining all of these contentions is the same consideration as before. The jury had already heard, without objection, the substance of all this testimony. And, finally, the Company gave none of these arguments to the trial judge as a ground for its objection to the Compaine testimony. The sole ground it asserted at trial was nondisclosure of Dr. Compaine as an expert.

## VI. DENIAL OF ADDITIONAL PEREMPTORY CHALLENGES

In empaneling the jury, counsel to the Claimant initially exercised three peremptory challenges. When those jurors were replaced, Claimant's counsel expressed her satisfaction with the jury. Counsel to the Company, at a side bar conference, then peremptorily challenged four jurors. As to another juror, he stated: "[T]he jury questionnaire indicates daughter was molested. I would raise that as a possible challenge for cause. It may become immaterial." The transcript says nothing further concerning this juror.

The Company, through affidavit of counsel, says the record of the side bar conference is incomplete. Counsel asserts the following also occurred: He sought to challenge a juror (the juror referred to in the transcript) for cause, which the court denied. Counsel then used a peremptory challenge to remove the same juror from the panel. The court informed counsel that this challenge was his last peremptory challenge. In response counsel noted that there were two defendants in the case, so that each should have four challenges and together they should have one additional challenge. The court disagreed and asked counsel if he still wanted to use his last peremptory challenge for that juror. Counsel responded in the affirmative and requested the court to note his objection.

What occurred thereafter is not disputed. The five jurors challenged by Company counsel were replaced. Claimant's counsel exercised a peremptorily challenge on one of the replaced jurors. When this juror was replaced, Claimant's counsel said she was satisfied with the jury. Company counsel then stated: "The defendant is content." The trial proceeded with the jury so empaneled.

▮ I assume, *arguendo*, that counsel's affidavit accurately sets forth what occurred.[15] Counsel was correct in asserting a right to a separate set of peremptory challenges for each defendant. "In a civil case each *party* shall be entitled to four peremptory challenges." Mass.Ann.Laws ch. 234, § 29 (Law.Co-op.1986) (emphasis supplied). If, as here, there are no more than two alternate jurors, each "side" is entitled to one extra peremptory challenge. *See* Mass.R.Civ.P. 47(b). Except for this additional right per side, peremptory challenge rights are afforded each party to a dispute in the case; there is not one set for all the plaintiffs and one set for all the defendants, at least when the plaintiffs are not exercising joint rights or the defendants are not alleged to be joint tort-

feasors. *See Kabatchnick v. Hanover–Elm Bldg. Corp.,* 331 Mass. 366, 119 N.E.2d 169 (1954). So, in addition to one peremptory challenge for each side (one for the Claimant and one for both defendants), the Claimant, the Company and Smith were each entitled to four peremptory challenges. *See, e.g., Henrickson v. Drewrys Ltd. U.S.A., Inc.,* 349 Mass. 679, 212 N.E.2d 247 (1965) (plaintiff entitled to full set of challenges for each of three defendants).

▮ There is, nevertheless, a basic deficiency in the Company's argument. "[A] refusal to allow the proper number of peremptory challenges [is] regarded as immaterial in the absence of a showing that the party affected was required to accept one or more jurors whom he wished to challenge." *Andras v. Marcyoniak,* 13 Mass. App.Ct. 1043, 433 N.E.2d 1260, 1262 (1982) (quoting from *Tamburello v. Welch,* 392 S.W.2d 114, 116 (Tex.1965)), *rev. denied,* 386 Mass. 1102, 440 N.E.2d 1176 (Mass. 1982). The Company makes no such showing here. To the contrary, it succeeded in striking from the panel the only five jurors to which it had expressed any objection. And after those jurors were replaced, and one additional juror challenged by the Claimant's counsel was replaced, Company counsel stated he was "content." At the argument in this court counsel could point to no juror he would have struck from the panel by peremptory challenge. Thus the case is quite different from *Tamburello,* where counsel testified that "if given an opportunity to do so he would have struck three jurors who served on the case." *Tamburello,* 392 S.W.2d at 117.

## VII. JURY'S DAMAGE AWARD

▮ The jury's award of $197,500 against the Company is comprised of $112,500 in "lost back pay," $50,000 in "lost front pay" and $35,000 in compensatory

---

**15.** The Defendant's motion to correct the record, which the Superior Court denied, sought to have the record reflect the contents of the affidavit.

damages. Lost back pay is the additional amount the Claimant would have earned from the time of wrongful discharge to the time of trial. Lost front pay is the amount of the Claimant's future loss of income, subject to a present value discount, based on the differential between what she was earning at the Company and what she is likely to earn in the future. *See Conway v. Electro Switch Corp.*, 402 Mass. 385, 523 N.E.2d 255 (1988). The Company contends the two lost pay awards are purely speculative.

The Claimant testified that her lost back pay to the date of trial amounted to $132,-000, which is less than what the jury gave her. As to lost front pay, she was then earning $30,000 per year, not the $45,000 annual salary the Company was paying her in 1992. The $50,000 which the jury gave her on lost front pay is certainly not excessive in light of this differential. Both of the jury's pay awards are consistent with the Claimant's testimony. Neither is speculative. Nor did the evidence compel the jury or the court to conclude that the Claimant had failed to mitigate her damages.

## VIII. ATTORNEY FEES

 The Superior Court increased the jury's award by giving the Claimant her costs and attorney's fees in the sum of $175,383.61. The court did this pursuant to the provision in chapter 151B authorizing the trial court to award a successful plaintiff "reasonable attorney's fees and costs unless special circumstances would render such an award unjust." Mass.Ann. Laws ch. 151B, § 9. The Claimant asks for an award of additional fees and costs with respect to post-trial services. The Massachusetts Appeals Court would have authority to remand to the Superior Court for the award of additional fees and costs related to the appeal. *See Melnychenko v. 84 Lumber Co.*, 424 Mass. 285, 676 N.E.2d 45, 51 (1997). Because my task is to take the action I believe would be taken in state court, I will award fees and costs under

the statute. I will award only fees and costs related to counsel's services on the appeal, including services in arguing the appeal here. I will award the Claimant nothing for the bankruptcy services of her counsel because these services are not within the sweep of the authorization contained in section 9. Within 14 days from today, Claimant's counsel shall submit a request for a specific amount of fees and costs related to such services, accompanied by detailed time entries. The Company shall file any objections to the request within 7 days of its filing.

## IX. ESTIMATION OF CLAIM BY *DE NOVO* REVIEW

Under the present approach to estimation of the claim, for the reasons previously given, I review *de novo* the entire appendix and all the testimony, except for one category of evidence. I exclude from my consideration all evidence admitted at trial, written and oral, to which either defendant lodged an objection, whether or not the evidentiary question is raised on appeal. This of course excludes the opinion testimony of Dr. Compaine. I also entirely ignore the Superior Court's jury instructions, whether or not objected to by either defendant, and apply the legal principles of sexual harassment previously set forth. This moots all evidentiary disputes, all objections to the judge's charge and the peremptory challenge issue.

Having completed this *de novo* review, I conclude that because of the conduct of Smith the Company is liable for both *quid pro quo* sexual harassment and hostile environment sexual harassment. Having also considered the evidence on damages, I would be inclined to assess greater damages against the Company than did the jury, largely because the $35,000 compensatory award may be insufficient to compensate the Claimant for her emotional distress. But because the Claimant has made no request for an increase in the jury award, I shall abide by the award.

I therefore allow the claim, for all purposes, in the amount found by the jury, plus the prejudgment interest and attorney's fees awarded by the Superior Court, plus postjudgment interest from April 26, 1997 to July 24, 1998, the date of the chapter 11 filing, at the statutory rate of 12%. *See* Mass.Ann.Laws ch. 231, § 6B (Law.Co-op.1986). This postjudgment interest comes to $56,827.46. The claim is thus allowed in the sum of $525,366.24, plus the future additional award for attorney fees and costs for the services of Claimant's counsel on the appeal. A separate and final order of allowance will issue upon my decision on the award of attorney fees and costs.